UNITED STATES of America,
Plaintiff–Appellee,

v.

Armand W. ROBINSON, Sr.,
Defendant–Appellant.

No. 86–2229.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1987.

Decided Sept. 18, 1987.

Rehearing and Rehearing In Banc
Denied Nov. 2, 1987.

Larry A. Landis, Indianapolis, Ind., for defendant-appellant.

John J. Thar, Asst. U.S. Atty., John D. Tinder, U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before COFFEY and MANION, Circuit Judges, and PARSONS, Senior District Judge.[*]

PARSONS, Senior District Judge.

Armand W. Robinson was convicted for drug-related offenses under a six-count indictment. In his appeal he challenges the district court's handling of voir dire, its having limited cross-examination of one of

---

* Hon. James B. Parsons, Senior District Judge of the Northern District of Illinois, is sitting by designation.

the prosecution's witnesses, an FBI informant, and its having admitted testimony concerning his, Robinson's prior involvement in cocaine traffic. Despite the seriousness of some of the concerns he raises about the manner in which his trial was handled, we affirm.

On March 20, 1986 Armand Robinson, his cousin Alan Robinson and a third defendant, Darwin Larkin, were before the court under a six-count indictment charging them with a number of drug-related offenses. Their trial began on May 13, 1986. On the second day of trial Alan Robinson entered a plea of guilty and later testified against the two remaining defendants. Then on May 22, 1986, while the trial was in progress, the Indiana Supreme Court disbarred Larkin's attorney, and a mistrial was declared as to Larkin. The trial proceeded on as to Armand Robinson alone, and on May 23, 1986, the jury returned verdicts of guilty on all six counts of the indictment.

The evidence against Robinson consisted of the testimony of a number of FBI agents, of a former co-defendant, Alan Robinson, and of the FBI informant, Marvin Garner, together with exhibits, including packages of cocaine, and paraphernalia for use in preparing it for sale. In addition there were transcribed tape recordings of telephone calls from Marvin Garner to Armand Robinson. These had been recorded in the presence of the FBI. And there was a transcription of a tape recording of a cocaine transaction at which Armand and Alan Robinson, Darwin Larkin, Marvin Garner, and one other individual who was never identified, were present. For purposes of this transaction, the FBI had fitted Garner with a body recorder and transmitter and had provided him with $2,200 with which to purchase an ounce of cocaine. The transaction that was recorded took place in a motel room. Once it was completed the FBI immediately executed warrants to search the motel room and proceeded to arrest Larkin and Alan Robinson while they were still present. By that time, however, Armand Robinson had left, but he soon was found and arrested also.

The unidentified participant was never caught.

The testimony of the informant, Garner, was in some respects problematic for the prosecution, and his own criminal background was extensive and included charges of forgery. Tape recordings made under the FBI's supervision transcended the issues of Garner's credibility, and their contents reveal Armand Robinson's active participation and guilt as charged in the indictment. The testimony that Alan Robinson presented after he had pled guilty created issues of credibility, but the jury was properly instructed as to the credibility issues, and, we assume, weighed the evidence in accordance with those instructions and found it sufficient to support a conviction. In his appeal Armand Robinson does not challenge the sufficiency of the evidence to convict. His claims of error are directed principally at the trial court's handling of evidentiary matters and especially at the court's handling of the jury voir dire.

I

█ Robinson challenges four aspects of the impaneling of the jury, two of which earn special concern. His first complaint is that the district court abused its discretion in refusing adequately to inquire concerning possible racial prejudice of the jury. Robinson acknowledges that he was present during cocaine transactions involving his codefendants and the FBI informant, Marvin Garner; but he defended his presence as being innocent, using the theory that an experienced vice officer must exercise discretion when determining whether or not to arrest participants in a drug transaction. Robinson, who is a black person, claimed that his decision to overlook a transaction between his cousin, Alan, and a friend, Larkin, was influenced by his training as a vice officer and "his role within the black, inner-city community." He said that his theory was that "if a black, inner-city police officer made arrests in every instance of an infraction or crime of which he is aware, he would soon have no contacts, no network, no sources, no

support within the black community, and no cooperation."

It is this alleged pressure on a black, inner-city police officer which, according to Robinson, necessarily injected the issue of race into his trial. He claims that a fair trial "depended on a jury who could understand" these pressures, and that the district court did not inquire into possible racial prejudice among the potential jurors far enough to permit him intelligently to ascertain whether or not a juror was prejudiced and would have been predisposed against his theory of the case.

Robinson's argument for a voir dire which would have educated the venire about this "black inner-city culture" theory misconstrues the purpose of voir dire. The constitutional (as opposed to the advocate's) purpose of voir dire is not to educate the veniremen about any particular facet of the case nor to condition them to embrace any theory (not already established as a matter of law or to be established by the use of expert witnesses). Its role is simply to ensure that the jury to be impaneled will be an impartial one. *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). To so ensure juror impartiality, the district court must make inquiry that is sufficient to allow it to perform its "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence...." *Id.* But an adequate voir dire also must protect "the defendant's right to exercise peremptory challenges" where they are allowed. *Id.*

Robinson concedes that specific questioning regarding racial prejudice is not required under the principles of *Turner v. Murray*, 476 U.S. 1, ——, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986); *Ristaino v. Ross*, 424 U.S. 589, 594–98, 96 S.Ct. 1017, 1020–22, 47 L.Ed.2d 258 (1976); *but see Ham v. South Carolina*, 409 U.S. 524, 527 (1973); but he claims that in his case the court, who conducted all of the voir dire, erred in not inquiring thoroughly on the issues of race prejudice. The standard we apply to this claim of error is that stated in

*United States v. Hastings*, 739 F.2d 1269 (7th Cir.1984): "This court will not find that a trial court abused its discretion in conducting voir dire where there is 'sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge.'" *Id.* at 1273 (quoting *United States v. Martin*, 507 F.2d 428, 432 (7th Cir.1974)).

In a sidebar conference during voir dire, Robinson's counsel made the following request to the court:

I request that the jury be asked whether they have had any life experiences with members of the opposite race, in particular black persons, which have left them with either strongly negative or strongly positive attitudes towards members of that race.

Transcript, Vol. II, at 124–28. Following this request, and over the prosecutor's objection, the trial court asked the jury:

Are there any of you who, from your own personal circumstances or background, who have had an experience that would cause you to feel with a particular prejudice or irrational feeling against any member of any race or religion or creed or moral persuasion if any such witness or person were to be presented before you in this case? If so, would you raise your hand?

Transcript, Vol. II, at 140. The district court also asked several other questions, not related to race, which were designed to elicit a response from any juror who could not be impartial and to impress upon each juror the solemn responsibility of deciding the facts of the case based on the evidence to be presented and not based on bias or preconception.

During the oral argument before us counsel for Robinson was given an opportunity to suggest what further questions should have been asked that would uncover ordinary racial prejudice among members of the venire. He was unable to suggest any such question. Although it is possible to repeat the same inquiry in several other forms to be sure it is well understood, we

conclude that the district court did not commit errors by not at his request or on its own initiative making further inquiry on this matter.

## II

Robinson's next claim of error regarding the voir dire concerns the district court's refusal to allow any follow-up inquiry into the acknowledgment by some members of the venire that they were aware of media publicity surrounding one or more of the attorneys in the case. Presumably, the court and the attorneys were aware of recent publicity about the attorney representing Darwin Larkin. According to Robinson's attorney, Larkin's attorney himself had just been charged in a state court case with possession of cocaine.

Upon Robinson's request, the court made the following inquiry of the venire:

You have had introduced to you the principal parties to the action and their lawyers. I have asked you if you knew the lawyers. Let me ask you a broader question.

Are there any of you who have heard of these lawyers prior to coming to court today—have you—

Let me ask if you heard it through a public medium, like radio, TV, newspaper, or through private associations—anyone who has heard of these lawyers through private associations? If so, would you raise your hand?

The jurors who raised their hands saying they heard of the lawyers were Mrs. Bailey—who else?—Mr. Yount, Mr. Bannon, Miss Crose—anyone else? Mr. Yount. All right.

Without identifying the lawyers, let me ask this: having heard something about the lawyers—I don't want you to tell what it is—would what you have heard interfere with your ability to make a fair and impartial decision in this case, without regard to who the lawyers are or identifying what you have heard, based only on the evidence and the law as it comes to you in the context of this case

and in this courtroom? If so, would you raise your hand?

Transcript, Vol. II, at 125.

No hands were raised in response to that question. During a recess, Robinson's attorney submitted a written request for additional voir dire. Later, the following exchange occurred between the court and him:

THE COURT: If I understand it, you have a follow-up question that you proposed with respect to the knowledge that some of the panel disclosed as to the identity of—having heard of one or more of the lawyers, and you have asked that I follow up on that. The court is going to decline to ask that question, Mr. Landis, for the reason that the follow-up question that the court put to those jurors or veniremen who responded was that "Whatever you know, from whatever source, would it interfere with your ability to act in a fair and impartial way and render a verdict only on the evidence and the law? And no one indicated that it would so interfere, so it doesn't matter what they heard, and that's what I don't want to get into.

MR. LANDIS: May I make a record on that point for the court, what my objection is—

THE COURT: You may.

MR. LANDIS: Thank you.

The objection is that, what your question—the question you asked was in response to my request to you that you inquire whether any of the jurors had heard of any of the lawyers, and three I believe indicated that they did.

And after they said they did, rather than asking them what they had heard, I believe your question was in effect, "Would that prevent you from rendering a fair verdict and being fair in this case?"

THE COURT: That's right. I said, whatever it was that you have heard, would it interfere.

MR. LANDIS: And that's proper to determine whether there should be an exclusion for cause.

My point is simply that I have a right on behalf of my client, my client certainly has a right to have me intelligently exercise peremptory challenges. In order to do that I need to know what they have heard about any of the lawyers that in my judgment may not make them fair in this case.

To do that I need the contents of what they have heard. If they have heard something about [Larkin's attorney], or about me, that in my judgment might slightly impair their abilities, even though it doesn't rise to the level of justifying exclusion for cause, it's very important, and that's what peremptory challenges are all about. I can't exercise peremptory challenge without knowing what they have heard.

THE COURT: Well, I did also inquire as to whether or not the source of their information was from a public medium, newspaper, radio, TV, that sort of thing. I even itemized the examples as I just did in this remark to you. And they all indicated yes, that's where they had heard of the lawyer. Or lawyers.

I am not going to permit a response to the court's question of a substantive nature as to what they have heard because of potential impact on the other jurors who heard nothing until they come to court today and hear it from a fellow juror.

So the only relevance as to that line of questioning is whether, whatever they've heard, it will interfere with their ability to render a fair and impartial decision. And to that question, giving them plenty of opportunity to think it over and make a response, the veniremen indicated that it would not.

MR. LANDIS: Your concern about contamination is shared by me, and that's why I requested that it be individually, the three of them that gave affirmative responses to the question, that they be called in individually and asked what they had heard.

THE COURT: Well, it's not even established on the record which of the lawyers or how many of the lawyers the veniremen have heard about.

MR. LANDIS: All the more reason why we need to know. I cannot exercise my peremptories—

THE COURT: I don't think that it provides any reason for you to know. That's why I'm going to exclude this question and overrule your request, counsel. Mr. Landis, do you understand the court's ruling?

MR. LANDIS: I understand it, judge, but I think—

THE COURT: Well then, you may accept the court's ruling and be seated and we don't need to have any theatrics from you in response.

MR. LANDIS: It's just that I don't—

THE COURT: Do you understand? All right. Be seated, please.

MR. LANDIS: I don't have any basis for it.

THE COURT: I explained it to you. I explained it to you. You may be seated.

Transcript, Vol. II, at 144–47. In selecting the jurors, the defendants exhausted all their peremptory challenges, and the district court denied their motions for additional peremptories. Two of the four members of the venire who had indicated knowledge about a lawyer or lawyers ultimately served as jurors.

The line of inquiry proposed by Robinson's attorney for these four prospective jurors was relevant and important to an intelligent exercise by him of peremptory challenges. *Rosales–Lopez*, 451 U.S., at 188, 101 S.Ct. at 1634. The manner in which he sought to have inquiry made was consistent with the procedure of this Circuit set forth in *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969); *see also United States v. Balistieri*, 779 F.2d 1191, 1214 (7th Cir.1985). The district court apparently did not understand the nature of his request because the reasons it offered for overruling it failed to address the concerns he raised. He sought to protect his right to exercise peremptory challenges intelligently. His request should have been allowed. *See United States v. Dellinger*, 472 F.2d 340, 370

(1972), *cert. denied* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). This is particularly true here where the knowledge of statements of the press about defense counsel may have related to the state's current criminal prosecution of one of them for drug offenses ... the very same criminal predicate upon which Robinson's own prosecution was based. It is a matter of common knowledge that there is a heightened public awareness about and fear of the consequences of the use and sale of illegal drugs. This easily could have infected prospective jurors with biases which, though possibly not of enough significance to justify challenges for cause, would likely be of enough significance to warrant prudent use of peremptory challenges. Even though the press stories related to Larkin's attorney only and to his having been charged in a cocaine case, there is a clear potential for overflow of juror bias on to Larkin himself, as well as on to his co-defendants and their lawyers. The voir dire permitted was inadequate under *United States v. Hasting, supra* at 1273.

This error, however, would not necessarily call for a reversal of Robinson's conviction. *See United States v. Taylor*, 569 F.2d 448, 454 (7th Cir.), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978). As the Supreme Court made clear in *Ristaino v. Ross*, absent a "constitutionally significant likelihood" that the jury impaneled in a federal court was not impartial, the review of claimed error during voir dire is grounded in the supervisory power of the reviewing court. 424 U.S. 589, 596 & 598 n. 10, 96 S.Ct. 1017, 1021 & 1022 n. 10, 47 L.Ed.2d 258 (1976). The matter is subject to the harmless error provision of Fed.R.Crim.P. 52(a). It follows that our ... "ultimate inquiry is whether there is any substantial likelihood that the defendants were denied a fair trial." *Balistieri*, 779 F.2d at 1214. Robinson conceded below that the responses of these venire-persons to the court's questions about knowledge of the lawyers were sufficient to insulate them from challenges for cause. Robinson did not below nor may he here urge error of constitutional dimension; nor does a wise application of our supervisory power otherwise mandate a reversal of Robinson's conviction.

A careful consideration of the whole of the record causes us to conclude that the trial court's failure to inquire further and individually of the venire-persons at the time and in the manner requested by Robinson's attorney did not result in "a substantial likelihood that Robinson was denied a fair trial." In arriving at this conclusion we place particular reliance on the following events that occurred later during the trial. On Monday, May 19, 1986, while the trial was in recess, Larkin's attorney was disbarred by the Indiana Supreme Court for reasons unrelated to his alleged involvement in cocaine. *See Matter of Stanton*, 492 N.E.2d 1056 (1986); clarified in part on prehearing, 504 N.E.2d 1 (Ind. 1987). The trial was recessed. When the trial was resumed on Thursday, May 22, the court granted Larkin's motion for mistrial on the ground that his attorney, although still a member of the federal bar, was "emotionally distressed" and unable to proceed on with Larkin's defense.

Pursuant to agreement with the prosecutor and Robinson's attorney, and in accord with the procedure of *Margoles*, the jurors were assembled and the trial court inquired fully of them whether any of them had been exposed to publicity surrounding the trial. Eight jurors answered affirmatively. The jury then was sent out of the courtroom, and each juror who had answered affirmatively was called in individually and asked to state what he or she had heard. Each acknowledged an awareness of the publicized stories concerning Larkin's attorney. The court then questioned each of these eight jurors at length, and explained to each the importance of not allowing these events to interfere with his or her duty to remain impartial in the case. Each juror assured the court that he or she would so remain. Thereafter the trial proceeded on against Armand Robinson alone.

At the end of the trial and during the court's instructions to the jury on the law, the jury was informed that the departure of Larkin as a defendant from the case was for reasons not related to Larkin's guilt or

innocence, and were outside those general matters which could be explained in detail to a jury. The jurors then were admonished not to speculate about the matter. We are confident that the district court's extensive questioning and admonishment of the jurors, and its instructions to them on the law, should have served well to enhance their commitments to fairness and impartiality. And although the right to adequate voir dire "is not to be an empty one," *United States v. Dellinger*, 472 F.2d 340, 368 (7th Cir.1972), our review of the transcript of the several occasions when the trial court did question them and of the entirety of its communications with the jurors convinces us that the court provided for Robinson by the time it proceeded to decide his case, a jury dedicated to fairness and impartiality.

As an incidental complaint about jury selection, Robinson urged (but apparently abandoned during rebuttal) some concern because the trial court excused from serving on the jury two prospective jurors: one who stated at the outset that she already had formed an opinion regarding the guilt or innocence of the defendants, and another who admitted that in 1975 he had been convicted of smuggling controlled substances. This claim would have failed even had it not been abandoned. *United States v. Matthews*, 803 F.2d 325, 328–29 (7th Cir.1986), *cert. granted*, — U.S. ——, 107 S.Ct. 1601, 94 L.Ed.2d 788 (1987). Robinson "was entitled to an array of impartial jurors to whom he may direct his peremptory challenges, but, having been provided with such a panel, he suffers no prejudice if a juror without sufficient cause, is excused by the Court." *Id.* (*quoting United States v. Calhoun*, 542 F.2d 1094, 1103 (9th Cir.1976)).

### III

 Before the trial began and in response to Robinson's motion for disclosure by the prosecution of the relationships between the government's agents and the informants who were to testify against him, the court conducted an in camera hearing in which the prosecution was permitted to limit its disclosures to those contacts between the FBI agents and the informants which related only to the specific transactions alleged in the indictment. Objections to disclosures of other background information involving Special Agent Guio and Informant Garner were sustained. The court then maintained this limitation during the cross-examinations before the jury of Guio and Garner. When Robinson called as one of his witnesses a local police investigator in an effort to establish that the state criminal charges against Garner that were dropped in return for Garner's testimony in this case were serious ones, he similarly was limited by the court's rulings sustaining objections to his questions. The court explained its ruling in these words:

> THE COURT: Well, the court had ruled previously in response to the motion in limine that the court would restrict testimony as to the underlying facts of the November case against Mr. Garner because they are irrelevant, they have potential to confuse the jury as to which facts pertain to which case, and furthermore would reject the testimony of this witness as to any prosecutive opinion that he may have as being outside the scope of his office and expertise. * * * Beyond that, the issue as to whether or not Mr. Garner performed in any particular way in connection with this case because he was afforded certain privileges and incentives by the government doesn't require your having to prove the issues about which you are adducing evidence, which are completely irrelevant, and they, beyond the confusion they create, stand to prolong the proceedings unduly. So I sustain an objection to that line of questioning as to the underlying facts of that case.

Transcript, Vol. IV, at 125–126.

Robinson argues that this type of limitation upon his examination of the principal witnesses against him requires reversal not only because he was deprived of his Sixth Amendment right to confrontation, but also because he was deprived of the opportunity to give the jury information from which they could determine the motives and biases of the witnesses who built the case

against him. In support of this position, appellant cites the recent decision of this court in *United States v. Rodgers,* 755 F.2d 533, 548 (7th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985), in which it was held that a trial court in similarly keeping out this same type of evidence did not abuse its discretion because the jury already had been given "sufficient information to make a discriminating appraisal of the witness's motives and bias."

A parallel claim of abuse of discretion in ruling on the admissibility of evidence is Robinson's complaint that the trial judge ruled the other way when it came to the admissibility of background information against him. Over his objections witnesses against him were permitted to testify about sales of narcotics by him, other than those charged in his indictment, as well as concerning his own use of cocaine, even though he had not been charged with the use of drugs nor with the possession or purchase of drugs for his own use. This testimony, he argues, was no less material than that he sought unsuccessfully to have admitted concerning the informant Garner.

The function of this court in reviewing a trial court's handling of problems such as this is to "not disturb [the] trial court's assessment of the equities that weigh for or against a particular result unless the trial court's judgment was clearly unreasonable." *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980). The trial court does not abuse its discretion when it precludes cumulative and confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *Smith v. Illinois,* 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968); *United States v. Hinton,* 683 F.2d 195, 200 (7th Cir.1982), *aff'd sub nom., Dixon v. United States,* 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984).

Here the defendant was permitted to inquire generally into Garner's relationship with the agents, including such matters as how much he was paid, how he was paid, how his relationship with the FBI compared with that of other informants, what conversations the federal agent had had with local law enforcement officials concerning pending state charges against the government's informant, and what state charges were pending against Garner.

A full review of the record supports the observation that the evidence against the appellant, other than that found in the testimony of the informant Garner, was substantial, and that the amount of exploration into the backgrounds of the accusatory witnesses that was permitted was not, under the circumstances, excessively limited. The court was aware that in narcotics cases effective investigation and prosecution often depend upon the use of informants in cooperation with staff agents, that the same informants may be used again or may be working on several different cases at the same time, and that the cross-examination of such informants must be monitored in a manner that would protect as far as possible their continued availability, but without depriving the defendant of the Sixth Amendment right of confrontation. Thus the well established guideline repeated in appellate reviews of these cases: that limitations in cross-examination may be applied as long as the jury has available to it sufficient information to make a "discriminatory appraisal of the witness's motives and bias." *United States v. Fitzgerald,* 579 F.2d 1014, 1021 (7th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978). *See also United States v. Xheka,* 704 F.2d 974, 984 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. DeGudino,* 722 F.2d 1351 (7th Cir.1983); *United States v. Rodgers,* 755 F.2d 533 (7th Cir.), *cert. denied,* 470 U.S. 1085 (1985).

\* \* \* \* \* \*

Finding no harmful error nor abuse of discretion in the trial of this case, we conclude that the disposition below should be affirmed and the judgment left to stand.

AFFIRMED.