UNITED STATES of America, Plaintiff–Appellee,

v.

James D. BATES, Defendant–Appellant.

No. 87–2271.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1988.

Decided July 7, 1988.

---

Michael J. Zopf, Reno, O'Byrne & Kepley, P.C., Champaign, Ill., for defendant-appellant.

Thomas E. Karmgard, U.S. Attys. Office, Danville, Ill., for plaintiff-appellee.

Before CUMMINGS, EASTERBROOK and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

A jury convicted James D. Bates on three counts of willful misapplication of bank funds by a bank officer in violation of 18 U.S.C. § 656. The court subsequently sentenced Bates to five years imprisonment under Count I, two concurrent terms of five years probation (each consecutive to the sentence under Count I) under Counts II and III, and ordered him to pay restitution of approximately $55,000 to the bank. On appeal Bates asserts two grounds for reversal and, alternatively, one ground for resentencing. First, Bates asserts that the Supreme Court's decision in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292, which dramatically altered the scope of the mail fraud statute, 18 U.S.C. § 1341, applies to the bank fraud statute under which he was indicted, 18 U.S.C. § 656, and vitiates his conviction. Bates also argues that the trial court violated his Sixth Amendment right to a fair trial when, despite potentially prejudicial

statements made by a prospective juror during voir dire in the presence of impaneled jurors, the court denied his motion for a mistrial. Finally, Bates argues that the trial court failed to exercise its discretion when it applied an automatic and mechanistic approach in sentencing him. We reject all of Bates' arguments and affirm the judgment of the district court.

## I

All three counts of misapplication of bank funds arise from loans Bates made in May and June 1982, while he was president and a director of the Lake Shore National Bank ("Lake Shore") in Danville, Illinois, that violated Lake Shore's lending policy. The relevant provisions of the lending policy required that (1) any loan, commitment, or renewal where the aggregate credit approved is in excess of the authority granted the lending officer be approved by the Board of Directors; (2) any loan, commitment, or renewal made to an employee of the bank in excess of $10,000 be approved by the bank's Officers Loan Committee; and (3) prior to making a loan in which an officer had a personal interest, the officer had to disclose that interest to either the Board of Directors or the Loan Committee.

The charge of willfully misapplying bank funds in Count I was based on a $28,000 loan Bates made in May 1982 to Carl George. In making this loan Bates deviated from the lending policy in two respects: he exceeded his aggregate lending authority and he actively concealed his personal interest in the loan. Lake Shore's lending policy limited Bates' authority to approval of commercial and installment loans in which the aggregate credit extended to an individual did not exceed $35,000 or for which Bates secured prior approval from the Board of Directors. At the time Bates approved the $28,000 loan to George, George had other outstanding loans at the bank totaling $46,500, so that the new loan brought his "aggregate credit," his total indebtedness to the bank, to $73,500. Although the amount of money involved in approval of this loan was more than double Bates' aggregate credit authority, he made the loan to George and did so without Board approval.

In addition, Bates had a personal interest in this loan. In May 1982 Bates and George agreed that Bates would sell George 700 shares of stock in Lake Shore. Then, because George did not have the funds necessary to effectuate the sale, Bates arranged the $28,000 loan to him from Lake Shore. George used $5,118.77 of the loan to pay off an existing debt at Lake Shore and deposited the remaining $22,881.23 in his personal checking account. He then wrote a personal check to Bates for $22,750 which Bates deposited in his personal checking account at Lake Shore. Three days later Bates transferred 700 shares of Lake Shore National Bank stock to George. Clearly, the true purpose of this loan was to finance George's purchase of stock from Bates. The loan documentation, however, omitted any reference to Bates and stated two purposes unrelated to the true purpose. In Bates' handwriting, the loan documentation stated that the "first purpose" was to "purchase/finance investments including resort property located in Scottsdale, ARIZ," and that the "second purpose" was "real estate investment." Bates failed affirmatively to disclose his interest in this loan to the Board of Directors or the Loan Committee prior to approval and his misrepresentations of the purpose of the loan were designed to prevent anyone else from discovering and disclosing his interest.

Count II contained a similar charge with respect to a May 28, 1982, transaction where Bates again made a loan that exceeded his aggregate credit authority and in which he had an undisclosed personal interest. In late May 1982 Bates agreed to sell his home to M. Eugene Wright for $118,000. As in the stock sale, Bates' purchaser lacked the necessary cash and Lake Shore again unknowingly provided it. Under the terms of the sales contract Wright assumed approximately $73,300 Bates owed on the house and borrowed, through Bates, $45,000 from Lake Shore on a commercial loan application that did not reveal that the proceeds of the loan were to purchase Bates' home. Lake Shore issued two

cashier's checks to Wright as a draw on the master note, one for $2,000 and the other for $43,000. The $2,000 check was used to pay the earnest money on Bates' home and the $43,000 check was deposited in Bates' Lake Shore checking account. Bates did not disclose his personal interest in this loan to either the Board of Directors or the Loan Committee. In addition, by lending Wright money to purchase his home, Bates again exceeded his aggregate credit authority. At the time Bates made the $45,000 loan to Wright, Wright's $53,000 existing indebtedness to Lake Shore already exceeded Bates' aggregate credit authority. By allowing this loan without prior Board approval Bates acted far beyond the scope of his authority.

Count III involves a $13,000 loan Bates made to himself on June 17, 1982, that had a ten-year repayment period and an interest rate of 13 percent. Bates used the proceeds of this loan to pay off existing debts to the bank that were either overdue or carried higher interest rates and shorter repayment periods. Specifically, Bates used the proceeds to pay off the following: (1) a $2,208.77 loan at 11 percent interest that had been overdue since February 1981, (2) a $6,898.03 loan at 15 percent interest, (3) a $1,534.57 loan at 18 percent interest, and (4) a $2,358.63 loan owed by his wife, Linda Bates, under the name Kay Kennedy. With this loan to himself Bates violated both Lake Shore's lending policy and federal law. Under the lending policy, all loans to bank employees in excess of $10,000 required approval by the Officers Loan Committee. Bates failed to obtain such approval. In addition, although Lake Shore's lending policy would have allowed the loan if Bates had obtained approval, federal banking regulations in effect in May and June 1982 prohibited Lake Shore from extending more than $10,000 credit to any executive officer of the bank. 12 C.F.R. §§ 215.3(a)(8), 215.4(b) and 215.5 (Regulation 0).

## II

Bates' primary argument is that the Supreme Court's decision in *McNally v.* *United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292, vitiates his conviction. The court in *McNally* reversed the conviction of two public officials for mail fraud under 18 U.S.C. § 1341 because it held that the mail fraud statute protects only property rights, not the intangible right of the citizenry to good government. *Id.* 107 S.Ct. at 2879. Bates contends that he was charged and convicted for violating his employer's right to the honest and loyal services of its employees, an intangible right, without any showing that the employer suffered a loss of property or money, or indeed, that a risk of such a loss was present. He therefore concludes that under *McNally* his conviction is invalid. Although Bates' contention is correct, his conclusion is not.

Bates was convicted under the bank fraud statute which provides in relevant part:

> Whoever, being an officer, director, agent or employee of ... any ... insured bank ... wilfully misapplies any of the moneys, funds or credits of such bank ... shall be fined not more than $5,000 or imprisoned more than five years, or both.

18 U.S.C. § 656. The current statutory language does not expressly require any proof of intent. Originally the statute did require proof of intent to "injure or defraud" the bank or "deceive" a bank officer but these words were inadvertently dropped in the course of a technical revision of the criminal code. To avoid making every unauthorized loan by a bank officer a willful misapplication of bank funds, courts, including our own, read the missing words back into the section. *United States v. Angelos*, 763 F.2d 859, 861 (7th Cir.1985); *United States v. Shively*, 715 F.2d 260, 266 (7th Cir.1983), certiorari denied, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233. Reading intent back into the statute, this Court distinguishes between intent to injure and intent to defraud because, although either will do, they are not the same. *Angelos*, 763 F.2d at 861. Intent to defraud means to take financial advantage of a confidential relationship

and does not require any intent to injure the bank. *Id.* at 861–862.

Recognizing that Section 656 is violated by either an intent to injure or an intent to defraud, the original indictment in Bates' case alleged the conjunction—intent to injure and intent to defraud. Following the presentation of evidence in Bates' first trial, see *infra* at 217, the district court directed a verdict for Bates on the question of intent to injure and entered a judgment of acquittal on those counts. Thus the only question at the second trial was intent to defraud and Bates is correct in his contention that he was neither charged with nor convicted of causing economic loss, or even the threat of potential loss, to the bank. His conclusion that *McNally* thus vitiates his conviction, however, is incorrect for two reasons: he misinterprets *McNally* itself and misapplies it to an unrelated statute, Section 656.

Bates argues that *McNally* limited the scope of Section 1341 to "the protection of property rights and not 'intangible rights.'" However, "*McNally* did not limit the scope of Section 1341 to tangible as distinguished from intangible property rights." *Carpenter v. United States,* —— U.S. ——, 108 S.Ct. 316, 320, 98 L.Ed.2d 275. *McNally* only distinguished between property rights and the intangible right of citizens to honest and impartial government. *Id.* Because Bates' case does not involve the right to good government, even if he had been convicted under the mail fraud statute it is not at all clear that his conviction would be invalid. His case is much closer to *Carpenter,* in which the Supreme Court held that a conspiracy involving an employee of the Wall Street Journal to trade on the Journal's confidential information was not outside the scope of the mail and wire fraud statutes, 108 S.Ct. at 320, than to *McNally.* However, we need not decide such a case because Bates was convicted under the bank fraud, not the mail fraud statute, and *McNally* is inapplicable to Section 656.

As we stated in *U.S. v. Gimbel,* 830 F.2d 621, 627 (7th Cir.1987), *McNally* is applicable to the wire fraud statute, 18 U.S.C. § 1343. We based this application on the language, legislative history and judicial construction of the statute. The language of Section 1343 proscribes the use of wire communications to facilitate "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises." 18 U.S.C. § 1343. This is precisely the same language contained in the mail fraud statute. The legislative history of the Communications Act indicates that in enacting the wire fraud statute Congress "intended merely to establish ... a parallel provision [to that] now in the law for fraud by mail." S.Rep. No. 44, 82d Cong., 1st Sess. 19 (1951). Finally, "we have consistently recognized that 'cases construing the mail fraud statute are applicable to the wire fraud statute.'" *Gimbel,* 830 F.2d at 627 (quoting *United States v. Feldman,* 711 F.2d 758, 763 n. 1 (7th Cir.1983), certiorari denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317). See *United States v. Herron,* 825 F.2d 50, 54 n. 5 and cases cited therein (5th Cir.1987) (stating that the "wire fraud statute and the mail fraud statute employ the same 'scheme or artifice to defraud' language, and the construction of either statute informs the application of the other"). See also *Carpenter,* 108 S.Ct. at 320 n. 6 (stating that "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here"); *United States v. Evans,* 844 F.2d 36 (2d Cir.1988) (referring to the wire and mail fraud counts collectively as the "federal fraud" counts, because both statutes share the same relevant language, and applying the same post-*McNally* intangible rights argument to both); *United States v. Eckhardt,* 843 F.2d 989 (7th Cir. 1988) (applying *Gimbel*); *United States v. Santa–Manzano,* 842 F.2d 1 (1st Cir.1988); *United States v. Covino,* 837 F.2d 65, 71 (2d Cir.1988) (holding that wire and mail fraud statutes are construed identically); *United States v. Cooke,* 833 F.2d 109, 110 (7th Cir.1987).

In contrast to the long line of cases recognizing the similarities between the mail fraud and wire fraud statutes and the

numerous recent cases applying *McNally* to wire fraud cases, Bates relies on one citation in a bank fraud case, *Angelos*, to a wire fraud case, *United States v. Dial*, 757 F.2d 163, 168 (7th Cir.1985), certiorari denied, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed. 2d 95, to support his assertion that *McNally* applies to the "sister" bank fraud statute. In *Angelos* we stated "[i]ntent to defraud—which means, to take financial advantage of a confidential relationship, as we noted recently in *United States v. Dial* ..., is all that is required to make out a violation of Section 656; intent to injure the bank need not be shown." *Angelos*, 763 F.2d at 861–862. This single reference is simply insufficient to establish the connection between the "sister" statutes that Bates urges.

In addition, the rationale for excluding actions for deprivations of the intangible right to good government from the scope of the mail fraud statute does not apply to the bank fraud statute. In *McNally* the Supreme Court stated that "the mail fraud statute ... had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property-holder." *McNally*, 107 S.Ct. at 2881 n. 8. In contrast, the bank fraud statute, which applies only to an "officer, director, agent or employee" of a covered bank or an agent or employee of the Federal Reserve, focuses on fiduciary responsibilities rather than property rights. Therefore, the definition of intent to defraud under Section 656 properly includes causing a loan to be made—knowing that you are violating proper banking procedures—from the bank that employs you for a transaction in which you have a personal interest and then actively concealing what you are doing. See, *e.g.*, *United States v. Holland*, 831 F.2d 717, 720 (7th Cir.1987) (post-*McNally* case holding that all that is required to prove misapplication under Section 656 is proof that the bank fiduciary took advantage of his confidential relationship with the bank); *Angelos*, 763 F.2d at 861.

## III

Bates argues that we should reverse his conviction and remand his case for a new trial because comments blurted out during voir dire in the presence of already impaneled jurors made it impossible for any of those jurors to serve impartially. Bates bases his argument on assertions that the procedures followed by the district court not only failed to cure the problem but made it worse.

The trial Bates now challenges as tainted by a biased jury was his second for the same offense; his first ended on March 26, 1987, in a mistrial when the jury was unable to return a unanimous verdict. On May 18, 1987, jury selection began for the second trial and a jury was impaneled, but for medical reasons the trial date was continued until June 8th. During the interim period, long-scheduled vacations and the death of a family member excused three of the impaneled jurors from serving, necessitating the selection of two additional jurors, one to serve on the jury and one to serve as an alternate. In the course of the voir dire process to select these additional jurors the complication arose that leads to this aspect of Bates' appeal.

The district court conducted the voir dire of the prospective jurors in the presence of the ten impaneled jurors who were seated in the jury box. The court began by providing the prospective jurors with background information about the case and introductions to the participants. Then the following exchange took place:

> The Court: Any of you ever read, hear, see anything about this case? Have any sort of knowledge about it at all?
>
> Mr. Buck: The last trial, I read about it.
>
> The Court: All right. You read a newspaper article. Wait a minute, now. Let me ask a question of you.

Mr. Buck, still in the presence of the impaneled jurors, then made a narrative statement not contained in the record. The court then conducted further voir dire of Buck, on the record, in chambers during which Buck informed the court that he had read two newspaper reports and seen television coverage concerning the case and

recalled from these reports that the first trial ended in a mistrial and that the number of counts had been reduced for the second trial.[1] The Assistant United States Attorney then challenged Buck for cause "[b]ecause of the—his knowledge of the dismissal of the two other counts that existed. He may misinterpret that as the defendant was not guilty." Over Bates' objection, the court excused Buck for cause.

Once Buck was excused for cause, on the government's motion that he would be prejudiced on behalf of Bates, Bates took the position that the opposite would instead be true, that the jurors who heard Buck's comments would be prejudiced against Bates because they would assume that Bates was found guilty at the first trial but for procedural reasons was granted a new trial. On this basis, Bates moved for a mistrial.

The judge denied the motion for a mistrial and instead conducted an individual voir dire of each impaneled and prospective juror to determine if he or she had heard what Buck said, and, if so, whether it would affect his or her consideration of the case. Only four of the jurors, all of whom were eventually impaneled, heard anything Buck said [2] and all four indicated that they would try the case only on the evidence presented in the courtroom.[3]

Following the individual voir dire, the district court "conclude[d] that none of these jurors were tainted in any way by the unfortunate volunteered remarks of Mr. Buck. And they have no chance of being tainted by him inasmuch as I excused him." The court then denied defendant's renewed

---

1. At the time jury selection began for the second trial, the United States Attorney made a motion to dismiss Counts II, IV and VI of the indictment and to proceed on Counts I, III and V (renumbered I, II and III).

2. THE COURT: Did you hear what Buck said?
MR. JONES: Just vaguely.
THE COURT: Could you repeat to me what he said?
MR. JONES: Something about he saw Mr.— the gentleman being—
THE COURT: Mr. Bates.
MR. JONES: The gentleman being escorted.
THE COURT: What else do you remember hearing Mr. Buck say?
MR. JONES: That's about it. (TR. at 26).
THE COURT: Did you hear what he [Buck] answered?
MR. JEHLE: He said that he had read something about it and they had dismissed two previous charges, something. I wasn't paying a lot of attention what they were talking about.
THE COURT: Can you repeat anything else he said?
MR. JEHLE: No. (TR. at 30).
THE COURT: Did you hear what Lawrence Buck, the alternate juror that I excused, said about having read, seen or heard something about this case?
MS. OSBORNE: I heard a little bit, but nothing.
THE COURT: Tell—repeat precisely as you can what you remember he said.
MS. OSBORNE: He said, "I saw them putting him in a car," and something about another trial. That's all I heard him say.
THE COURT: That's everything you heard that he said?

MS. OSBORNE: Yes. I assumed maybe he was confused and was talking about another trial is what I took it as. (TR. at 36).
THE COURT: Did you hear what Mr. Buck said?
MR. MORR: He said he read something in the—
THE COURT: Tell me as near as you can exactly what you heard Buck say.
MR. MORR: I remember him saying that he—I don't remember if it was seeing it on TV or whether it was a newspaper. He showed a picture, I think it showed a picture of him taking away or something. That's about all.
THE COURT: Is that the whole of what you remember Mr. Buck saying?
MR. MORR: Yeah. (Tr. at 40).

3. The following colloquy is representative of the type of inquiry the court made into the potentially prejudiced juror's ability to serve impartially:
THE COURT: Would you be able to put out of your mind what [Buck] said?
MR. JEHLE: Yes, I already have.
THE COURT: Would that have any effect on you and affect your ability to be fair and impartial in the case?
MR. JEHLE: No, it wouldn't.
THE COURT: Would you try the case only on the evidence you hear in Court and the Court's instructions on the law?
MR. JEHLE: Yes.
THE COURT: And you understand whatever Buck may have said has no relevance in this case?
MR. JEHLE: Yes.

motion for a mistrial and the jury selection continued in open court.

The district court followed the procedure required in this Circuit when pre-trial publicity (in this case second-hand publicity) is brought to the court's attention. Under the procedure:

[t]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he had read or heard any of the publicity in question, the judge is not required to proceed further.

*United States v. Peters,* 791 F.2d 1270, 1299 (7th Cir.1986), certiorari denied, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (quoting *Margoles v. United States,* 407 F.2d 727, 735 (7th Cir.1969), certiorari denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84); see also *United States v. Robinson,* 832 F.2d 366, 370–371 (7th Cir.1987), certiorari denied, — U.S. —, 108 S.Ct. 1739, 100 L.Ed.2d 203; *United States v. Balistrieri,* 779 F.2d 1191, 1213–1214 (7th Cir. 1985), certiorari denied, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 573; *United States v. Trapnell,* 638 F.2d 1016, 1022 (7th Cir. 1980). Individual examination of each juror was required here because, unlike the usual situation, the question was not whether there had been any exposure to publicity, for everyone was in the courtroom at the time Buck made his comments, but the extent and effect of the exposure.

Bates admits that the procedure the district court followed was required, but he nevertheless argues that it was wrong. He contends that the procedure did too little and too much; too little because it was inadequate to ensure a fair and impartial jury and too much because the individual examination drew even more attention to Buck's statements. Although the procedure may have done too little and too much to satisfy Bates, it was just right to satisfy the Constitution.

Due process requires that an accused be tried by an impartial jury free from outside influences, *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 but impartiality does not mean complete ignorance of issues and events, *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751. If a juror can put aside his or her impressions gained from pretrial publicity and render a fair verdict based upon the evidence, the impartiality requirement is satisfied. *Dobbert v. Florida,* 432 U.S. 282, 302, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344. Each of the jurors who remembered any of Buck's remarks stated that he or she would put that phase out of their mind and not consider it in their deliberations of the case. Each also stated that he or she would try the case only on the evidence heard in court and the court's instructions on the law. This is sufficient to satisfy due process.

Bates' argument that the individual voir dire compounded the problem by drawing even more attention to Buck's statements is also without merit. The voir dire effectively determined the extent of each juror's exposure to and retention of Buck's comments. Although Chief Judge Baker pressed the jurors on the extent of what they already knew, and in that way brought formal attention to Buck's comments, his questions were general—"What did you hear?" "What do you remember?" He did not ask specific questions such as "Did you hear about the first trial?" or "Do you remember how many counts were dismissed?" Although the court's request for precision may have forced the jurors to focus more closely on what they already knew, in almost every instance this should have had a minimizing effect as the jurors realized that they had heard very little and remembered even less. The jurors who heard and remembered anything at all were told by the court, and stated that they understood, that anything Buck may have said had no relevance in the case. The individual voir dire did not compound the problem created by Buck's comments.

In a perfect trial Buck would not have commented as he did. However, the dis-

trict court responded appropriately and Bates received a trial before an impartial jury.

## IV

Finally, Bates attacks the sentence imposed by Chief Judge Baker. Bates acknowledges that the sentence imposed, five years imprisonment on Count I and five years probation on each of Counts II and III (the probation terms to run concurrent to each other but consecutive to the imprisonment), falls within the statutorily permissible bounds of Section 656. Bates further acknowledges that an appellate court generally has no power to change a sentence that falls within the legislatively imposed limitation. Yet Bates persists in attacking his sentence because he asserts that the district court "employed a mechanistic application in pronouncing sentence" and that in such circumstances this Court has greater power to review the sentence. We disagree with Bates' representation of the sentencing hearing, and because the district judge acted appropriately we affirm the sentence.

The general rule on review of sentences is that "once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end unless the sentencing judge relied on improper or unreliable information in exercising his or her discretion, or failed to exercise any discretion at all, in imposing sentence." *United States v. Main*, 598 F.2d 1086, 1094 (7th Cir.1979), certiorari denied, 444 U.S. 943, 100 S.Ct. 301, 62 L.Ed.2d 311; see also *United States v. Daniels*, 446 F.2d 967, 969–971 (6th Cir.1971) (reversing sentence due to mechanical imposition). The general rule is largely premised on the belief that the trial judge, who has the best opportunity to observe the defendant and evaluate his character, will exercise discretion in imposing sentence. On that assumption we defer to the trial court's judgment. But, as the exception recognizes, when the trial court has not exercised discretion in imposing sentence, this reason for deference fails and the appellate court does not usurp the discretion vested in the district court when it reviews the sentence. *Woosley v. United States*, 478 F.2d 139, 144 (8th Cir.1973).

As support for his argument Bates cites four cases in which the appellate court reviewed and reversed a sentence that was within the statutory limits for the offense: *United States v. Hartford*, 489 F.2d 652, 655 (5th Cir.1974) (sentence reversed because district court utilized a rigid sentencing policy based solely on the crime with which the defendant was charged, narcotics violation); *Woosley*, 478 F.2d at 143 (sentence reversed because district court's policy was to sentence all young men convicted of refusing induction into the military to the maximum prison term); *Daniels*, 446 F.2d at 971–972 (sentence reversed because district court mechanically imposed five-year sentences on all those who refused to obey an order of a draft board); *United States v. McCoy*, 429 F.2d 739, 743 (D.C. Cir.1970) (sentence reversed because of district court's stated policy that anyone convicted by a jury of armed robbery would receive a sentence of life imprisonment). None of these cases, however, supports review of Bates' sentence. All of them involved a sentencing policy of uniform sentences for particular offenses without regard for any individual mitigating or aggravating circumstances. The evidence in the record clearly indicates that Chief Judge Baker did not have a policy that, for example, all bank officers convicted under Section 656 will be used to establish a general deterrent and therefore will be sentenced to five years imprisonment. That such a policy did not exist is evidenced by the fact that under the same statute, Section 656, Judge Baker sentenced another officer of the same bank, vice-president Wilkinson, to a lesser sentence of thirty months.

Even admitting that the district judge did not apply a uniform sentence to all bank officers convicted under Section 656, Bates would argue that the manner in which his sentence was imposed violated the modern penological philosophy, accepted in *Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 of indi-

vidualizing sentences.[4] However, both the transcript and written order on final disposition belie this assertion. The court discussed the presentence report with Bates and defense counsel and agreed with some and disagreed with other of their objections. "When the judge states that he read the presentence investigation report, we should presume he considered the matters raised therein." *United States v. Sato*, 814 F.2d 449, 452 (7th Cir.1987), certiorari denied, — U.S. ——, 108 S.Ct. 294, 98 L.Ed.2d 254. When the judge discusses specific statements on specific pages of the presentence report we can be certain that he considered the matters raised therein. In addition to the matters raised in the presentence report, the record indicates that the court also considered what Bates' sentence would be if the sentencing guidelines were in effect and that this case appeared to be one in which general deterrence could be particularly effective. See *United States v. Torres*, 733 F.2d 449, 462 (7th Cir.1984) (stating that consideration of general deterrence is proper provided that it does not result in a mechanistic imposition of sentencing). Clearly, when the court imposed the legislatively permissible sentence on Bates it exercised its discretion and that exercise was not an abuse of its discretion.

The judgment of conviction and the sentence imposed are AFFIRMED.

---

4. The Sentencing Reform Act of 1984 was not yet effective at the time of Bates' sentencing, but we note that the Act, which seeks to promote uniformity in sentencing by requiring judges to defer to the guidelines established by the U.S. Sentencing Commission, will, if ultimately held constitutional, represent a great curtailment of judicial discretion to individualize sentences. See *United States v. Sato*, 814 F.2d 449, 452 (7th Cir.1987), certiorari denied, — U.S. ——, 108 S.Ct. 294, 98 L.Ed.2d 254.