**UNITED STATES of America**

v.

**Philip E. JAKEWAY, Jr., and Wilfred American Educational Corp., Defendants.**

No. 88–233–Cr–T–17(C).

United States District Court, M.D. Florida.

Jan. 14, 1992.

---

Fran Carpini and Tom Findley, Asst. U.S. Attys., Fort Myers, Fla., for U.S.

Rebekah J. Poston, Fine Jacobson Schwartz Nash Block and England, Miami, Fla., for defendant Philip E. Jakeway, Jr.

Theodore Klein, Miami, Fla., for defendant Wilfred American Educ. Corp.

## ORDER

GAGLIARDI, Senior District Judge.

Defendants Philip E. Jakeway, Jr. and ·Wilfred American Educational Corporation (hereinafter "Wilfred") move for a judgment of acquittal pursuant to Rule 29 and for a new trial pursuant to Rule 33. The defendants were charged in a sixty-five count indictment. Count one of the indictment charges Jakeway with conspiracy to defraud the Department of Education in violation of 18 U.S.C. § 371. Wilfred is not charged in count one. Counts two through twenty-nine charge both defendants with causing false statements to be made on student applications for federal financial aid in violation of 18 U.S.C. § 1001 (hereinafter "falsification counts").[1] Counts thirty through fifty-six charge both defendants with willfully embezzling, misapplying and stealing U.S. Department of Education Funds in violation of 20 U.S.C. § 1097(a) (hereinafter "misapplication counts").[2] Counts fifty-seven through sixty-four charge both defendants with wire fraud in violation of 18 U.S.C. § 1343. Finally, count sixty-five charges both defendants with RICO in violation of 18 U.S.C. § 1962(c).

The defendants were convicted on all but a single misapplication count and a single wire fraud count. The defendants argue, among other things, that the evidence presented at trial is insufficient to support their convictions. For the reasons set forth below, this court grants Jakeway's motion for judgment of acquittal on all counts. Wilfred's motion for judgment of acquittal is granted on counts thirty through sixty-five. Wilfred's motion for judgment of acquittal and for a new trial on counts two through twenty-nine is denied.

### Facts

Wilfred operated cosmetology and business schools throughout the United States. This indictment concerns Wilfred cosmetology schools in Tampa, Orlando and St. Petersburg, Florida (hereinafter "Middle District Schools"). These schools participated in United States Department of Education Title IV student financial aid programs, including the Guaranteed Student Loan Program (hereinafter "GSL") and the Pell Grant Program. A student's eligibility for these programs was based on representations made on the student's applications. From about 1982 to 1985, admissions representatives and financial aid coordinators at the Middle District Schools routinely directed students to falsify financial aid applications.

Students applied for a "financial aid package," which was made up of Pell Grants and GSL loans. Students received financial aid funds to pay Wilfred's tuition and additional money to pay school-related expenses. Wilfred's tuition was due in full on the first day of classes. Financial aid funds were sent directly to the Wilfred schools in Florida. The money, however, would usually be sent to the schools in installments after the student began attending classes. As the money was received, it was applied directly to the cost of tuition. At some point, Wilfred would receive money in excess of the student's tuition, generating an "overpayment." Wilfred's records reflected the correct balance in the student's account.

---

1. Counts five and twenty were dismissed on the government's motion.

2. Counts thirty-one, thirty-eight, forty-two, forty-four, and fifty-three were dismissed on the government's motion.

Jakeway was President, Chief Executive Officer and a principal stockholder of Wilfred. The next level of authority was the regional vice president of Florida operations, Guido S. Sanchez. Sanchez reported directly to Jakeway. Sanchez pled guilty, cooperated with the government and testified at trial. Defendant Rosemarie V. Tyson was Wilfred's financial aid manager. Tyson supervised the financial aid programs for the Florida schools. Tyson reported directly to Sanchez. Tyson also pled guilty, cooperated with the government and testified at trial. A school manager supervised each individual Florida school. At the lowest level were the individual schools' admissions representatives and financial aid coordinators.

In the falsification counts, the government alleged that the defendants caused subordinate employees of Wilfred to direct students to falsify financial aid applications. In the misapplication counts, the government alleged that the defendants misapplied financial aid funds by purposely delaying the return of the overpayment to the students and by returning Pell overpayments to the lending agency to reduce the principal amount outstanding on the students' GSL. The wire fraud and RICO counts are based upon the same conduct alleged in the misapplication counts. Finally, the conspiracy count alleges that Jakeway conspired with others to falsify financial aid applications and misapply financial aid funds.

## I. *Falsification Counts*

■ A convicted defendant bears a very heavy burden to demonstrate that the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt. To reverse convictions, this court must find that reasonable minds could not remove all reasonable doubt as to the defendants' guilt. *United States v. Simon*, 839 F.2d 1461, 1465 (11th Cir.1988), *cert. denied*, 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988). This court must view the evidence in a light most favorable to the government, drawing all inferences and resolving all credibility choices to support the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct.

457, 86 L.Ed. 680 (1942); *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir.1988).

■ The indictment charges both defendants with filing false applications for federal student financial aid in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2. The elements of the offense are: (1) knowingly and willfully; (2) falsifying, concealing, or covering up by trick, scheme, or device; (3) a material fact; (4) in any matter within the jurisdiction of a department or agency of the United States. *See United States v. Swaim*, 757 F.2d 1530, 1533 (5th Cir.1985), *cert. denied*, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985).

■ Jakeway was charged under the theory of aiding and abetting. To be guilty of aiding and abetting, the prosecution must show: (1) that the substantive offense was committed; (2) that the defendant committed an act which contributed to and furthered the offense; and (3) that the defendant had the intent to aid in the commission of the substantive offense. *United States v. Pareja*, 876 F.2d 1567, 1568 (11th Cir.1989). Jakeway claimed that he did not know that subordinate employees of Wilfred were causing students to falsify applications. The element of knowledge can be satisfied by the inference from the evidence that the defendant deliberately closed his eyes to the existence of certain facts. *United States v. Aleman*, 728 F.2d 492, 494 (11th Cir.1984); *United States v. Restrepo–Granda*, 575 F.2d 524 (5th Cir. 1978), *cert. denied*, 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978).

■ The issue before the court is whether there is evidence sufficient to prove beyond a reasonable doubt, that the defendant knew, or consciously avoided knowing, of the pattern of misconduct by subordinate employees in the Middle District Schools. This court concludes that the evidence is insufficient to establish knowledge.

Despite the fact that the subordinate employees responsible for the falsifications cooperated with the government, no testimony at trial established that Jakeway or

anyone outside a small group of individuals encouraged false applications. Indeed, these employees admitted that they concealed their activities and that it was not Wilfred's policy to encourage false applications. Tyson and Sanchez testified that at no time prior to the government investigation were they aware of the employees' misconduct. Under the company structure, it was from these individuals that Jakeway was to receive his information concerning the Middle District Schools. No individual in the chain of command between Jakeway and the subordinate employees testified that he put Jakeway on notice of the falsifications. Moreover, none of the individuals responsible for the Middle District Schools testified that they were aware of the falsifications or even suspected that misconduct was occurring.

The best evidence the government offers to show knowledge is a 1981 letter from a Department of Education official notifying Jakeway of a student complaint that an employee in the St. Petersburg school suggested the student falsify her application.[3] This single complaint of alleged misconduct is insufficient to establish Jakeway's knowledge or conscious avoidance of knowledge. Indeed, this matter was apparently resolved to the satisfaction of the Department of Education because after further correspondence no action was taken.

The government also relies on the fact that Wilfred, at Jakeway's direction, implemented a policy where certain student applications would be sent to Wilfred's self-lending program before being sent to private lending institutions.[4] In order to qualify for a loan through Wilfred's lending program, students were required to submit a loan denial statement indicating that the student was turned down for a loan in the private sector. The government argues that Jakeway must have known that the loan denial letters associated with these applications were false. This court disagrees. The students might have contacted the banks, without formally submitting an application, to find out that those banks did not lend to Wilfred students. The evidence at trial was that throughout the period of the indictment few, if any, banks in the Middle District area were lending to Wilfred students. Moreover, the application may not have contained a loan denial letter. There was no evidence presented at trial linking an application to this memorandum. There was no evidence presented that Jakeway ever saw any of the student applications. At most, the government has established violations of the regulations governing the self-lending program. But, from this evidence, a reasonable trier of fact could not conclude, beyond a reasonable doubt, that Jakeway had knowledge, or consciously avoided knowing, of the pattern of false applications.

The government also relies on evidence that prejudiced the defendants in the eyes of the jury, but does not establish Jakeway's knowledge or conscious avoidance of the falsifications. The government relies on Jakeway's answer to the question on the Department of Education form 1059, which asked if commissioned sales persons were used to recruit students. Wilfred did use commissioned sales people in the application process. The government points out that Jakeway ignored Tyson's questions concerning the appropriateness of using commissioned sales people in the application process. The government also relies on Sanchez's testimony that Jakeway directed him to use the school-related expense money as a marketing strategy to encourage students to enroll. These incidents may establish violations of civil regulations, but they do not prove beyond a reasonable doubt knowledge on the part of the defendant.

The government also refers to Gloria Mendez's testimony. Mendez, a registrar for Wilfred from March, 1977, to January, 1981, testified that Jakeway was present at a meeting in 1977 when National Sales Vice

---

3. This employee was not named in the indictment and no evidence was presented that the employee actually directed anyone to falsify an application.

4. Florida was the only state where Wilfred became a school lender in the GSL Program.

President Ann Lovett made a statement to the effect that even Rockefeller could qualify for a grant if he lived with his mother and she was on social security. Mendez stated that this was Lovett's "very famous phrase." Mendez also testified that there was some discussion at this meeting on how a student from a "very-well-to-do family" could qualify if at the present time she is living with her boyfriend and he supports her. Mendez, however, could not recall whether Jakeway or Lovett said this, but she stated both were present and discussed the same subject. This evidence may establish that Wilfred instructed employees on how to take advantage of certain loopholes in the regulations. But, this evidence does not establish that the Jakeway directed or encouraged false applications. Without more the jury could not properly conclude that Wilfred's obvious ethical shortcomings proved or inferred Jakeway's guilt beyond a reasonable doubt. Viewing the evidence in the light most favorable to the government, this court concludes that the evidence is insufficient to establish the defendant's knowledge or deliberate ignorance of the falsifications. Therefore, Jakeway's motion for judgment of acquittal as to those counts is granted.

 Even if the evidence were sufficient to sustain Jakeway's conviction as to these counts, this court would grant the defendant's motion for a new trial as to all counts. Throughout this trial, the government has repeatedly confused Wilfred's ethical shortcomings and possible regulatory violations with substantive proscriptions of criminal law. The government repeatedly elicited testimony concerning Wilfred's unprofessional practices without ever relating that evidence to the crimes charged in the indictment. In addition, violations of federal civil regulations do not create criminal offenses prosecutable in federal court. References to regulations are improper if their purpose or effect is to suggest to the jury that it could find a defendant guilty by reason of his violation of the regulation. *See United States v. McElroy*, 910 F.2d 1016, 1023 (2d Cir.1990); *United States v. Stefan*, 784 F.2d 1093, 1098 (11th Cir.1986), *cert. denied*, 479 U.S.

1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986). Improper evidence such as this constitutes grounds for a new trial when there is a reasonable likelihood that the evidence affected the defendant's substantial rights. *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991); *United States v. Stout*, 667 F.2d 1347, 1352 (11th Cir.1982). This court finds that there is a reasonable probability that the jury relied on this improper evidence in determining Jakeway's guilt as to all counts. Therefore, this court would grant the defendant's motion for a new trial.

 Wilfred is in a different situation, however. To establish the guilt of a corporate defendant the government must demonstrate that in committing the illegal acts the corporate agents intended, at least in part, to benefit the corporation and that those acts were committed within the scope of the agents' employment. *See United States v. Gold*, 743 F.2d 800, 823, 825 (11th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). The evidence is clear that employees of Wilfred directed students to falsify financial aid applications. Aside from a small commission, the proceeds of those applications went to the corporation. Wilfred is liable for the falsification counts because there is sufficient evidence to establish that the actions of the subordinate employees were intended, at least in part, to benefit the corporation and were within the scope of those agents' employment. Moreover, because the evidence of Wilfred's guilt with respect to the falsification counts was overwhelming, Wilfred was not prejudiced by the improper evidence admitted in this case. There is no reasonable likelihood that that evidence affected the jury's decision as to Wilfred's guilt.

## II. *Misapplication Counts*

Counts thirty through fifty-six charge that Wilfred and Jakeway misapplied Title IV funds in violation of 20 U.S.C.

§ 1097(a).[5] The defendants contend that the conduct relied on by the government could not have constituted a "misapplication" of funds in violation of section 1097(a), therefore, the evidence is insufficient to support their convictions.

■ To establish misapplication the government must prove (1) a conversion of the property to the use of the defendant or a third party and (2) fraudulent intent.[6] *See United States v. Acosta,* 748 F.2d 577, 580 (11th Cir.1984).

■ The first element of misapplication is the conversion of Title IV funds from the owner of the funds. Conversion for the purposes of misapplication is no different from conversion for tort purposes. Conversion involves an act of dominion or control over the property that seriously interferes with the owner's rights. *United States v. Stockton,* 788 F.2d 210, 216 (4th Cir.1986), *cert. denied,* 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89. The mental state required for conversion is the specific intent to appropriate the property. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 15, at 92–93 (5th ed. 1984). Inherent in the concept of conversion is that the act of dominion or appropriation is without authorization from the owner of the property. Knowledge that the property belongs to another, or that the appropriation is unauthorized by the owner, is not necessary to establish a conversion and civil liability. Criminal liability attaches when conversion is coupled with knowledge that the appropriation is prohibited.

■ In this case, the evidence is insufficient to establish either civil conversion or fraudulent intent. The government concedes that Wilfred's initial possession of the financial aid funds was proper. First, the government argues that the misapplication was caused by the delay between the time funds were received and the time they were paid out. Conversion can exist even though the defendant's original possession of property was proper. However, absent a demand for the property by the owner or a legal duty to turn the property over to the owner, there can be no conversion. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 15, at 98–100 (5th ed. 1984). In this case, Wilfred held the overpayment until the student's graduation and then turned the money over to the student sometime after graduation. All funds were either eventually turned over to the student or returned to one of the Title IV programs. There is no statute which prohibits a school from holding excess student loan funds until graduation in the event that the student incurs additional charges. There is no Department of Education regulation that requires these funds be turned over to the student within a specific time period. *See* Guaranteed Student Loan Program, 34 C.F.R. § 682 (1990); Pell Grant Program, 34 C.F.R. § 690 (1990).[7] Absent any demand by a student, this court cannot conclude from the evidence presented that

---

**5.** Section 1097(a) provides:

> Any person who knowingly and willfully embezzles, misapplies, steals, or obtains by fraud, false statement or forgery any funds, assets or property provided or insured under this subchapter and part C of subchapter I of chapter 34 of Title 42 shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both....

20 U.S.C. § 1097(a).

**6.** This circuit has not defined the term "misapplication" in the context of 20 U.S.C. § 1097(a). The term has been defined in the context of other statutes, including 18 U.S.C. § 656, which deals with misapplication by a bank officer or employee. As the Supreme Court noted, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952). Misapplication differs from embezzlement only in that embezzlement requires the additional element of previous lawful possession or "entrustment" that is not necessarily an aspect of misapplication. *See United States v. Acosta,* 748 F.2d 577, 580 (11th Cir.1984).

**7.** All references to regulations are to the current C.F.R. As far as this court was able to determine, aside from the numbering system, the relevant regulations in effect during the time period of the indictment were substantially the same.

Wilfred converted the student's funds by simply retaining them until the student graduated. In addition, the period of time that Wilfred held the funds after graduation (or, in a few instances, after a student demand) cannot be said to be so unreasonable that as a matter of law a conversion occurred.

■ Moreover, the evidence is insufficient to establish fraudulent intent. The best evidence the government offers to show fraudulent intent is Department of Education program reviews that objected to Wilfred's expense advance policy. *See* Government Exhibits 1C30G; 1C30J. Those program reviews stated that funds received by the school on behalf of a student were to be either immediately credited toward the student's cost of attending school or paid to the student in conformity with generally accepted accounting principles for educational expenses. Jakeway informed the appropriate official of the way Wilfred was handling the expense advance money and defended Wilfred's actions in reference thereto. After that, no further action was taken by the program reviewer or anyone higher up in the Department of Education. Thus, the government's evidence was insufficient to establish that Wilfred's retention of overpayment funds was prohibited; it certainly did not show Jakeway's intent to violate that prohibition.

■ The evidence is also insufficient to establish misapplication by returning Pell funds to the GSL agency. There is no statute or regulation which prohibits using excess Pell funds to pay a portion of the students GSL. The students had signed written authorizations permitting Wilfred to use the excess funds to pay student loans. Those students testified at trial that they never intended to do this. However, the written agreement to the contrary speaks for itself. No reasonable trier of fact could find beyond a reasonable doubt a conversion of the students' funds when those funds were used in a manner authorized by the students in writing. The conduct is simply not prohibited by any regulation or agreement between the parties.

The evidence presented was insufficient for the jury to conclude beyond a reasonable doubt that a conversion had occurred.

■ Again, the evidence is insufficient to prove criminal intent. The government argues that Wilfred's motive for using Pell funds to pay a portion of the students' GSL was to prevent or delay student defaults on those loans. Without more, there is nothing improper with this alleged motive. The government, however, referring to Department of Education regulations that prohibit a school from participating in certain Title IV programs when the school's default rate reaches a certain level, attempts to establish a fraudulent scheme by the defendants. The only evidence of this alleged scheme are two memos. *See* Government Exhibits 1A1OF; 1C3OQ1O. The first, dated January 5, 1983, from Jakeway, refers to the default rate limitations and the importance of preventing student defaults. *See* Government Exhibit 1A1OF. The memo does not refer to using Pell funds to pay GSL loans. The second, dated March 28, 1988, from the "Executive Committee," states that "[i]t is very important that all possible refund dollars be disbursed to the Lender to reduce the students loan obligation. This will make the loan amount less discouraging to students and will encourage them to begin their monthly payments of the balance." *See* Government Exhibit 1C3OQ1O. This memo was years after the misapplications alleged in this indictment and it does not refer to using Pell funds to pay GSL loans. These two memos are insufficient to establish this alleged scheme. The evidence presented is insufficient to sustain the defendants' convictions for misapplication in violation of section 1097(a). Therefore, this court grants both defendants' motions for judgment of acquittal as to those counts. Judgment of acquittal is granted on the wire fraud and RICO counts because they are based on the same conduct.

■ In addition, if the evidence were sufficient to sustain the defendants' convictions on counts thirty through sixty-five, this court would still grant both defendants' motions for a new trial for two

reasons. First, this court would grant a new trial in light of the jury's possible reliance on Wilfred's unethical conduct and potential violations of civil regulations in determining guilt. Indeed, the jury sent the following note during deliberations: "We need to see the Federal Regulation which spells out the time frame between drawn down date and disbursement date to the student for Title 4 funds." This note obviously related to their decision on the misapplication counts. There is a reasonable likelihood that the jury relied entirely on potential violations of regulations in determining the defendants' guilt as to these counts. Therefore, this court would grant the defendants' motions for a new trial on the misapplication, wire fraud and RICO counts.

■ Second, counts thirty through fifty-six charge that the defendants "did, willfully and knowingly, embezzle, misapply and steal funds, assets and property" provided under Title IV in violation of 20 U.S.C. § 1097(a). The indictment did not charge the defendants with the "obtaining by fraud, false statement or forgery" section of the statute. This court mistakenly included that section of the statute in its charge to the jury.[8]

By instructing the jury that it may satisfy the section 1097(a) offense by finding that the defendant obtained financial aid funds by "fraud, false statement or forgery" the court permitted the jury to convict on a crime not charged in the indictment. See Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); United States v. Vowiell, 869 F.2d 1264, 1271 (9th Cir.1989). For this reason alone, this court would grant the defendants a new trial as to counts thirty through sixty-five.

## III. Wire Fraud and RICO Counts

■ There is also insufficient evidence to support the wire fraud and RICO counts because the wire transfers relied on by the government in this case do not satisfy the wire transfer element of the crime of wire fraud. To convict the defendants of wire fraud the government must prove (1) participation in a scheme to defraud, and (2) use of a wire communication in interstate commerce to further the scheme. United States v. Simon, 839 F.2d 1461, 1465 (11th Cir.1988). The wire transfers at issue are the transfers of funds from Wilfred accounts in Florida to Wilfred's central account at the Philadelphia National Bank in Philadelphia, Pennsylvania. The government has failed to prove that these wire transfers would have furthered any alleged scheme involving the financial aid funds.

The wire transfer need not be an essential element of the scheme. Schmuck v. United States, 489 U.S. 705, 710, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). It is sufficient for the wire transfer to be 'incident to an essential part of the scheme,' ... or 'a step in the plot.'" Schmuck v. United States, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); see also United States v. Smith, 934 F.2d 270, 271 (11th Cir.1991).

■ In this case, the wire transfer was done by the defendant, after the defendant had received the funds from the Title IV program. The purpose of the wire transfer was to centralize Wilfred's funds by using a cash management system typical for corporations of Wilfred's size. Simply because the defendant chooses, at some later time, to move funds to another account by means of a wire transfer does not make the crime alleged a wire fraud. Had Wilfred chosen to use the funds from a bank in Florida, which it clearly could have done, there would have been no wire transfer.

---

**8.** The jury charge stated:
 A defendant can be found guilty of this offense only if all of the following elements are proven beyond a reasonable doubt.
 *First:* That the defendant embezzled, misapplied, stole or obtained by fraud, false statement or forgery any student financial aid funds;

*Second:* That the defendant did so knowingly and willfully; and
 *Third:* That the amount of money embezzled, misapplied, stolen or obtained by fraud, false statement or forgery was greater than $200.

This court fails to see how the wire transfers in this case furthered any alleged scheme by the defendants. The wire transfers at issue were simply not incident to an essential part of the alleged scheme. For this reason alone, this court would grant both defendants' motions for judgment of acquittal as to the wire fraud and RICO counts.

### IV. *Conspiracy*

For the above reasons, the evidence is insufficient to prove beyond a reasonable doubt that Jakeway knew of a conspiracy and had the deliberate, knowing and specific intent to join or associate himself with it. *See United States v. Gold,* 743 F.2d 800, 823, 824 (11th Cir.1984). In addition, were it not for the court's determination that the evidence is insufficient to support this conviction, this court would grant the defendant's motion for a new trial for the reasons previously set forth.

### *Conclusion*

Jakeway's motion for judgment of acquittal as to all counts is granted. Wilfred's motion for judgment of acquittal is granted as to counts thirty through sixty-five. Wilfred's motion for judgment of acquittal and for a new trial as to counts two through twenty-nine is denied.

So Ordered.