UNITED STATES of America,
Plaintiff–Appellee,

v.

Elizabeth KAMMER, Defendant–
Appellant.

No. 92–6343.

United States Court of Appeals,
Eleventh Circuit.

Sept. 14, 1993.

Rebekah J. Poston, Fine, Jacobson Schwartz, Nash, Block, & England, Komal J. Bhojwani, Miami, FL, William L. Webber, Howrey & Simon, Washington, DC, for defendant-appellant.

J.B. Sessions, III, U.S. Atty., Richard W. Moore, Mobile, AL, for plaintiff-appellee.

Before FAY and HATCHETT, Circuit Judges, and ATKINS *, Senior District Judge.

HATCHETT, Circuit Judge:

We reverse the misapplication convictions in this case because the government failed to prove that the appellant's failure to refund Pell Grant monies constituted a misapplication under 20 U.S.C. § 1097(a).

## I. FACTS

During 1988, Elizabeth Kammer, appellant, owned and operated Coastal Training Institute (CTI), a vocational training school in Mobile, Alabama. Some of the students attending CTI were eligible for Pell Grants from the federal government or guaranteed student loans (GSL) from a private lender.

When students were awarded Pell Grants through the Department of Education's (DOE) Pell Grant program, CTI held the Pell Grants awarded to the students in trust for the DOE pursuant to 34 C.F.R. § 668.16.[1] When these students enrolled, CTI would withdraw the funds from its trust account and deposit them into CTI's operating account for tuition. If, however, the students with Pell Grants withdrew prior to completing the course of study, regulations required that CTI refund the unearned portions of the Pell Grants to the federal trust fund within thirty days, pursuant to 34 C.F.R. § 668.22(e)(5).[2] No unearned portion of a Pell Grant could be used for any other purpose. 34 C.F.R. § 668.16. To obtain guaranteed student loans, the students would apply for a loan from a private lender. After obtaining the loans, the students would deposit them with CTI for tuition. CTI would then deposit the funds in its operating account. According to the regulations, if students who received these loans withdrew prior to completing the course, the unearned portions of the loans had to be refunded to the lender within sixty days, pursuant to 34 C.F.R. § 682.607(c).[3]

---

* Honorable Clyde C. Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Title 34 C.F.R. § 668.16 states:

Funds received under the Pell Grant SEOG, CWS, ICL, and Perkins Loan programs, except those funds received for the administrative cost allowance, are held in trust for the intended student beneficiaries and the Secretary. The institution, as a trustee of Federal funds, may not use or hypothecate (i.e. use as collateral) Title IV, HEA program funds for any other purpose.

2. Title 34 C.F.R. § 668.22(e)(5) states:

The amount of the Title IV, HEA program portion of the refund allocated to the Title IV, HEA programs other than the CWS, GSL, PLUS and SLS programs must be returned to the appropriate program account(s) by the institution within 30 days of the date that the student officially withdraws or is expelled or the institution determines that a student has unofficially withdrawn.

3. Title 34 C.F.R. § 682.607(c) states:

Timely payment. A school shall pay a refund that is due—
(1) within sixty days after the earliest of the—
(i) Student's withdrawal as determined under § 682.605(b)(1)(i) or (b)(3);
(ii) Expiration of the academic term (e.g. semester, quarter or trimester) in which the student withdrew as determined under § 682.605(b)(1)(ii);
(iii) Expiration of the period of enrollment for which the loan was made; or
(iv) The date on which the school makes a determination that the student has withdrawn under § 682.605(b)(1)(ii); or
(2) In the case of a student who does not return to school at the expiration of an approved leave of absence under § 682.605(c), within 30 days after the last day of that leave of absence.

During the spring of 1989, Kammer decided to open a new school in order to reduce the overall default rate because a high default rate could render a school ineligible to participate in the federal loan program. For a student to be admitted to the new school in Prichard, Alabama, CTI required that the student have a high school diploma, GED, college work, or pass the CPAT, a standardized test. Thus, if a student failed the CPAT, CTI would not enroll the student, and CTI would not receive federal financial aid funds.

Judy Martin, a CTI employee, administered the CPAT at the Prichard campus. On one occasion, Kammer called Martin and stated, "They will all pass, won't they?" Martin responded affirmatively and altered students' CPAT scores so that ineligible students would qualify for federal financial aid funds.

During the summer of 1989, a CTI employee informed Kammer that someone was falsifying test scores at the Prichard campus. Although Kammer stated that she would talk to Judy Martin about the test scores, CTI employees testified at trial that she never investigated the alleged falsification of test scores.

CTI's financial condition deteriorated; students failed to remain enrolled; and Kammer failed to refund the unearned portions of federal financial aid funds. Instead, Kammer partially operated CTI with the unearned federal financial aid funds. Specifically, Kammer used $160,561.11 of federal funds to operate CTI.[4]

In January, 1990, a DOE program reviewer appeared unannounced at CTI for a program review. The program reviewer noted that withdrawn students' files contained copies of non-negotiated refund checks, but that refunds had not actually been made. Kammer explained to the program reviewer that she was "aging debts," meaning that the most necessary and immediate debts were being paid first; other debts, including federal financial aid refunds, were "aged" so that the oldest debts could be identified readily and paid as funds became available.[5]

In April, 1990, CTI closed, and shortly thereafter filed for bankruptcy.

## II. PROCEDURAL HISTORY

On September 19, 1991, a federal grand jury returned charges against Kammer in a twelve-count indictment. Count I was for conspiracy, in violation of 18 U.S.C. § 371. Counts II through XII were for embezzling, misapplying, and stealing federal financial aid funds in violation of 20 U.S.C. § 1097(a) and 18 U.S.C. § 2. After a two-day trial, the jury convicted Kammer on all twelve counts.

The district court denied Kammer's motion for judgment of acquittal. Eventually, the district court also denied Kammer's supplemental motion for acquittal.

The district court sentenced Kammer to concurrent terms of twenty-seven months imprisonment, without parole, as to all counts. The district court also imposed supervised release for a concurrent term of three years as to all counts with special conditions of restitution of $160,561.11 to DOE. The restitution is to be paid in three installments of $53,520.37 each during the period of supervised release and 100 hours of community service for each of the three years of supervised release. The district court also required Kammer to pay a special assessment of $600.

## III. CONTENTIONS

Kammer contends that this court must reverse the conspiracy count because of insufficiency of the evidence. Additionally, Kammer contends that this court must reverse the criminal misapplication convictions because on the facts of this case her actions do not constitute crimes, but rather violations of civil regulations. Consequently, the evidence was insufficient to establish criminal misapplication. Additionally, Kammer contends that this court must remand the case to the

---

4. Pell Grants are federal funds. 34 C.F.R. § 668.16. GSLs are federally insured funds. 34 C.F.R. § 682.100.

5. Kammer's "most necessary and immediate debts" included her salary, campus renovations, consulting fees, loan repayment to her husband, and her private housekeeper.

district court because it misinterpreted the United States Sentencing Guidelines.

The government contends that the evidence sufficiently proved a conspiracy between Kammer and Martin. The government also contends that the evidence sufficiently established that Kammer misapplied federal financial aid funds because the civil regulations create a reversionary interest in the federal monies in requiring the unearned portions of the federal financial aid funds to be returned within a specific time. Thus, the unearned portions of the federal financial aid funds remained property of the United States. Moreover, the government contends that it did not equate violation of a civil regulation to criminal intent nor did the district court charge the jury that it could find Kammer guilty for violating a civil regulation. The government also contends that the district court properly sentenced Kammer.

## IV. ISSUES

We must determine whether the evidence viewed in a light most favorable to the government sufficiently proved a conspiracy between Kammer and Martin in violation of 18 U.S.C. § 371. Additionally, we must determine whether the evidence viewed in a light most favorable to the government sufficiently proved that Kammer embezzled, misapplied, and stole federal financial aid funds in violation of 20 U.S.C. § 1097(a).

## V. STANDARD OF REVIEW

■■■ We review *de novo* sufficiency of the evidence claims, viewing the evidence in a light most favorable to the government. *United States v. Kelly,* 888 F.2d 732, 739–40 (11th Cir.1989). When reviewing a sentence under the guidelines, however, this court will not overturn the district court's factual findings unless they are clearly erroneous. *United States v. Griffin,* 945 F.2d 378, 380–

81 (11th Cir.1991), *cert. denied sub nom. Edwards v. United States,* —— U.S. ——, 112 S.Ct. 1958, 118 L.Ed.2d 561 (1992).

## VI. DISCUSSION

### A. Conspiracy

■■■ The jury found Kammer guilty of a conspiracy against the United States in violation of 18 U.S.C. § 371.[6] To sustain a conviction under section 371, the government must prove: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." *United States v. Harmas,* 974 F.2d 1262, 1267 (11th Cir.1992) (citation omitted). The Supreme Court has defined a conspiracy to defraud the United States as "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Harmas,* 974 F.2d at 1267 (citing *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966)). Additionally, the Supreme Court has required that the United States be the target of a conspiracy to defraud under section 371. *Harmas,* 974 F.2d at 1267 (citing *Tanner v. United States,* 483 U.S. 107, 128–32, 107 S.Ct. 2739, 2751–54, 97 L.Ed.2d 90 (1987)). After reviewing the record, we hold that the evidence was sufficient to prove Kammer conspired to defraud the United States in violation of section 371.

First, Martin, who altered the students' test scores thereby allowing otherwise ineligible students to receive federal financial aid funds, pleaded guilty to the conspiracy charge and testified at Kammer's trial. Kammer denies that she instructed Martin to falsify test scores with her question, "They will all pass, won't they?" Martin, however, testified that she understood Kammer's question to mean that students taking the CPAT

---

6. Title 18 U.S.C. § 371 states:

  If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof *in any manner or for any purpose,* and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ... or both.

  If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

should all pass rendering them eligible for federal financial aid funds. Additionally, Dean Bentley and Joyce Jackson, other CTI administrators, testified that they informed Kammer of the false test scores at the Prichard campus, but Kammer failed to take remedial action and instructed them to stay away from the Prichard campus. Additional evidence showed that Kammer pressured employees to bring students into the Prichard campus to set a monthly quota.

Kammer also contends that Martin's altering of the students' test scores was immaterial because it was not beneficial to her in any way. Kammer suggests that the CPAT was not required for students to be eligible for federal financial aid funds.

"All [section 371] requires is that two or more persons conspire to commit an offense against or otherwise defraud the United States and that one or more of such persons do an act in pursuit of that objective." *United States v. Booty*, 621 F.2d 1291, 1297 (5th Cir.), *modified on other grounds*, 627 F.2d 762 (5th Cir.1980).[7] In this case, sufficient evidence exists to conclude, as the government contends, that Kammer and Martin believed that a passing score on the CPAT was required to obtain federal financial aid for students who otherwise failed to have a high school diploma, GED, or college work. Because of this belief, Kammer and Martin conspired to alter and falsify CPAT scores to defraud the government and acquire funds they were not entitled to receive. *See Booty*, 621 F.2d at 1297–98.

### B. Criminal Misapplication

■ Kammer contends that the evidence in this case is insufficient to prove criminal misapplication, does not establish criminal

intent, and does not prove civil conversion. Rather, according to Kammer, the evidence only proves that federal financial aid refunds were not timely paid. Because we find the evidence insufficient to establish criminal misapplications, we reverse Kammer's criminal misapplication convictions based on 20 U.S.C. § 1097(a).[8]

■ To establish a criminal misapplication, the government must prove (1) a conversion of the property to the use of the defendant or a third party, and (2) fraudulent intent. *United States v. Jakeway*, 783 F.Supp. 590, 597 (M.D.Fla.1992) (extrapolating the elements of criminal misapplication from *United States v. Acosta*, 748 F.2d 577, 580 (11th Cir.1984), finding that misapplication under 18 U.S.C. § 656 is the "willful taking of an insured bank's money by its employee with intent to defraud the bank" (emphasis omitted)).

■ The first element of misapplication is conversion of the property. Conversion is "an act of dominion or control over the property that seriously interferes with the owner's rights." *Jakeway*, 783 F.Supp. at 597. In this case, the government did not establish a conversion.

This conclusion dictates a discussion of how Pell Grand funds are disbursed. DOE would transfer Pell Grant funds to CTI's Pell Grant Federal Funds Account to be held in trust pending disbursement to students for tuition. CTI then would transfer funds into CTI's corporate operating account to pay students' tuition debts to CTI. Similarly, CTI deposited students' GSLs into its operating account. CTI paid its operating expenses, refunds for withdrawn students, and other debts to its creditors out of its corporate operating account. The government ar-

---

**7.** According to Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**8.** Title 20 U.S.C. § 1097(a) states:

Any person who knowingly and wilfully embezzles, misapplies, steals, obtains by fraud, false statement or forgery, or fails to refund any funds, assets, or property provided or insured under this subchapter or part C of subchapter I of chapter 34 of Title 42 or attempts

to so embezzle, misapply, steal, obtain by fraud, false statement or forgery, or fail to refund any funds, assets, or property, shall be fined no more than $20,000 or imprisoned for not more than 5 years, or both, except if the amount so embezzled, misapplied, stolen, obtained by fraud, false statement, or forgery, or failed to be refunded does not exceed $200, then the fine shall be not more than $5,000 and imprisonment shall not exceed one year, or both.

gues that according to 34 C.F.R. § 668.-22(e)(5) and § 682.607(c), CTI must refund the unearned federal financial aid funds within either thirty days for a Pell Grant or sixty days for a GSL.[9] The government is correct in pointing out that Pell Grants are to be refunded within thirty days and GSL funds are to be refunded within sixty days. These regulations, however, do not prohibit CTI from commingling the federal financial aid funds with its other monies. In fact, 34 C.F.R. § 690.81(b) states that a "separate bank account for Pell Grant funds is not required." Thus, when a student withdrew, CTI may not have had sufficient funds in its operating account to reimburse DOE because it had expended monies for other obligations. After all, CTI could not control the timing of a student's withdrawal.

The government submitted legislative history on the Higher Education Act of 1965, indicating that "failure to pay refunds does constitute criminal misapplication under current law." H.R.Conf.Rep. No. 630, 102d Cong., 2d Sess. 413, 513 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 528, 628. Thus, Congress indicated that persons who failed to refund grant funds to the government could be charged with criminal misapplication. As indicated earlier, however, the regulations allow CTI to commingle its own monies with federal financial aid funds. *The fact that CTI may have paid operating expenses before a student withdrew, and thus did not have money to refund DOE is not a conversion.* What happened in this case is exactly what the program anticipated: a commingling of funds with grant funds being used for operating expenses. Any financially endangered institution would be in the same position as CTI, with no criminal intent to defraud. Under these circumstances, we cannot find that the government intended to maintain supervision and control over the

funds after the point of the commingling of the funds.

■■ Moreover, the government has not demonstrated that Kammer had the requisite intent to defraud the government. Kammer claims that she put copies of non-negotiated refund checks in the withdrawn students' files because she intended to refund the money as it became available. The government contends that Kammer put the non-negotiated copies of refund checks in withdrawn students' files to "look like refunds had been made." Even accepting the government's version, we do not find fraudulent intent. It is undisputed that the DOE program reviewer appeared unannounced at CTI for a program review. Kammer was unaware that a DOE representative was coming for a program review. The non-negotiated check evidence is all the government offers to show criminal intent. Even in the light most favorable to the government, that evidence is insufficient. Thus, we hold that the evidence was insufficient to establish criminal misapplication.[10] We emphasize that we do not hold that a failure to refund federal monies will never constitute a crime. We reverse in this case strictly on the facts of this case.

### C. Sentencing

In light of our reversal on Counts II through XII, we remand the case to the district court for resentencing.

## VII. CONCLUSION

We affirm Kammer's conviction for conspiracy to defraud the government in violation of 18 U.S.C. § 371. We reverse Kammer's convictions for criminal misapplication in violation of 20 U.S.C. § 1097(a), and remand the case to the district court for all matters regarding sentencing.

---

9. The government refers the court to *Jakeway,* which, in dicta, inferred that a conversion could be established under 34 C.F.R. § 682 (GSL program) and 34 C.F.R. § 690 (Pell Grant program) because those regulations require refunds to be paid within a specific time period. *Jakeway,* 783 F.Supp. at 597. Although we find the general principles set forth in *Jakeway* helpful to this case, we are not persuaded by *Jakeway*'s unsup-

ported inference regarding the GSL and Pell Grant programs.

10. Because we reverse Kammer's criminal misapplication convictions, we find it unnecessary to address the issue of prosecutorial misconduct, which related to the criminal misapplication convictions.

AFFIRMED in part, REVERSED in part, and REMANDED.