**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Garrit BATES, Defendant–Appellee.**

**No. 95–2203.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1996.

Decided Sept. 20, 1996.

---

Ruth Hennage (argued), Office of the U.S. Attorney, South Bend, IN, for Plaintiff-Appellant.

C. Richard Oren (argued), Rochester, IN, for Defendant-Appellee.

Before CUDAHY, FLAUM, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After Garrit Bates was charged with twelve counts of willfully misapplying federally guaranteed Title IV student aid funds, he filed a pretrial motion to dismiss the indictment as insufficient. Specifically, he argued that both conversion and intent to injure or defraud the federal government are elements of the offense of willfully misapplying financial aid monies and that the indictment had failed to adequately allege either one. The district court granted his motion to dismiss after determining that the indictment failed to allege intent to injure or defraud the United States, and the government appeals to this court. Because we find that a conviction for willful misapplication of Title IV funds does not require proof of the defendant's intent to injure or defraud the United States, and that the indictment is otherwise sufficient, we vacate the judgment of the district court and reinstate the prosecution.

### I. HISTORY

Given that the district court determined that the indictment was insufficient on its

face, for this appeal we take the facts as they are alleged in the indictment, which are set out below. James and Laurenda Jackson are the owners and operators of Education America, Inc., a for-profit consulting and management firm for various technical and vocational schools. In December 1986, the Jacksons acquired ownership of the Acme Institute of Technology, a not-for-profit technical school located in South Bend, Indiana. After the acquisition, the Jacksons appointed Bates, who was vice president of Education America at the time, to act as Acme's chief financial officer and treasurer of the Acme board of trustees.

On April 30, 1987, Mr. Jackson, acting as president of Acme, signed a program participation agreement with the Department of Education. Under the agreement, Acme became authorized to receive student loan checks through the Title IV federal Guaranteed Student Loan ("GSL") program, but participation in the program was contingent upon (1) Acme's continued accreditation by an approved accrediting association, and (2) Jackson's promise to comply with all statutes and regulations governing the GSL program. Around the same time, Bates signed a similar participation agreement for a different school owned by Education America, and he therefore presumably understood the responsibilities imposed by the Acme participation agreement.

Through the GSL program, banks and other private financial institutions would lend money to Acme students for tuition and other educational expenses. The federal government's role was to administer the loan program and guarantee payment of the loans in the event any of the student borrowers defaulted. Loan checks were mailed directly to Acme and, once endorsed, were credited against the student's tuition debt. However, if a student with a GSL withdrew from Acme prior to completion of a term, federal regulations required Acme to refund a portion of the loan proceeds to the lender within 30 or 60 days from withdrawal (depending on the date of the loan application), which was then to be deducted from the amount owed. Of course, if loan refunds were not made, the student—and, in the event of default, the

government—would nonetheless remain liable to the lender for the full amount of the loan.

On April 14, 1988, Mr. Jackson sent a letter to the director of Acme instructing him (1) to remit 10 percent of Acme's gross receipts from the previous month to Education America as a management fee, and (2) to arrange for a specified monthly salary to be paid by Acme to the Jacksons. The letter explained that if these required payments caused Acme to experience a cash shortfall, Education America would loan money back to Acme in order to cover the discrepancy. As chief financial officer of Acme, Bates had the authority to determine which of Acme's bills would be paid as they came due, and he repeatedly gave these fee and salary payments to Education America and the Jacksons priority over refunds to lenders of student loan monies for withdrawn students. In doing this, Bates would specifically direct Acme employees not to make required student loan refunds. By the end of September 1988, Acme had amassed a GSL refund debt of approximately $55,000.

In late 1988 or very early 1989, Education America officials directed Acme to discontinue using a special bank account that was designed to segregate unearned student loan monies (those that should have been earmarked for refunds) from the school's general funds account. When Acme's refund arrearage had grown to around $68,000 by January 1989, Acme's financial aid director sent a letter to Mr. Jackson frustratedly pointing out the seriousness of failing to pay refunds of Title IV monies. In March 1989, Acme's unpaid student loan refunds totaled $85,000. That month, Bates notified Acme's financial aid director, at her request, that she was absolved of all legal responsibility concerning refunds on GSLs and that such refunds would be "solely the responsibility and decision of the corporate office."

In April 1989, the National Association of Trade and Technical Schools ("NATTS"), a national accrediting association, performed an on-site audit of Acme for the purpose of determining whether it should continue to accredit the school. In its May 1990 report to the Department of Education, NATTS

found that Acme had "inadequately demonstrated its ability to make appropriate and timely refunds," and that it had "loaned substantial amounts of money" and engaged in the "upstreaming" of management fees to Education America and its owner, Mr. Jackson, who also happened to be Acme's president and chairman of the board of trustees.

After losing its accreditation, Acme received notice from the Department of Education that effective March 8, 1990, Acme was no longer eligible to participate in the GSL program. On June 5, 1990, Acme closed its doors, having accrued a total student loan refund debt of $139,649, not including interest and certain special allowances.

On September 8, 1994, a federal grand jury handed down a twelve-count indictment against Bates. Following a recitation of the facts set out above, the indictment charges that on twelve separate occasions between January 15 and June 15, 1990, Bates knowingly and willfully misapplied specified amounts of federally guaranteed student loan funds, in violation of 20 U.S.C. § 1097 and 18 U.S.C. § 2. At the time of Bates's alleged wrongdoing in 1990, § 1097(a) declared guilty of a crime "[a]ny person who knowingly and willfully embezzles, misapplies, steals, or obtains by fraud, false statement, or forgery any funds, assets, or property provided or insured under [Title IV of the Higher Education Act of 1965]...." 20 U.S.C. § 1097(a).

On February 7, 1995, Bates filed a motion to dismiss the indictment. The memorandum in support of his motion argued first that conviction under § 1097(a) for willful misapplication of student aid funds requires proof of both conversion and the defendant's intent to injure or defraud the United States, and second, that the indictment failed to allege sufficient facts to constitute conversion and neglected to allege intent to injure or defraud the United States at all. The district court agreed that § 1097(a) requires proof of the intent to injure or defraud the government and that the indictment had failed to allege such intent, and it therefore granted the motion and dismissed the indictment.

## II. ANALYSIS

█ The government appeals from the judgment of dismissal, arguing (1) that a conviction for willful misapplication of Title IV funds does not require that the government demonstrate the defendant's intent to injure or defraud the United States, and (2) that regardless of whether § 1097(a) requires a showing of such intent, the indictment was facially sufficient. We address these separate arguments in turn. Our review of a district court's determination concerning the facial sufficiency of an indictment is *de novo*. *Frank v. United States*, 914 F.2d 828, 830 (7th Cir.1990) (citing *United States v. Bucey*, 876 F.2d 1297, 1301–02 (7th Cir.), *cert. denied*, 493 U.S. 1004, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989)). We likewise engage in plenary review of a district court's statutory interpretation. *United States v. Shriver*, 989 F.2d 898, 901 (7th Cir.1992).

### A. Intent to Injure or Defraud the United States

█ A basic tenet of criminal law provides that *actus non facit reum nisi mens sit rea,* meaning an act does not make one guilty unless his mind is guilty. Thus, at common law, nearly all crimes required proof that the defendant not only committed a wrongful act, but that he did so with the requisite *mens rea*, or culpable mental state. As history has witnessed the statutory codification of criminal offenses, enacting legislatures have employed such words as "intentionally," "willfully," or "purposefully" to signify the common law requirement of mental culpability. *See Morissette v. United States*, 342 U.S. 246, 251–52, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952).

█ But criminal intent (even when differentiated from such other, lesser mental states as objective knowledge, recklessness, or negligence) is an elusive concept—some crimes may demand proof of only the defendant's *general* intent to engage consciously and voluntarily in the proscribed conduct, while other crimes may additionally require proof of the defendant's *specific* intent to effectuate a particular result. 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE

CRIMINAL LAW § 3.5, at 302–18 (1986 & Supp. 1996). On this appeal, we must reach the question we declined to answer in *United States v. Ross,* 77 F.3d 1525, 1546 (7th Cir. 1996): whether conviction under 20 U.S.C. § 1097(a) for willfully misapplying federally insured student aid funds requires the government to allege and prove the defendant's specific intent to injure or defraud the United States.

In *Morissette,* the Supreme Court instructed:

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

342 U.S. at 263, 72 S.Ct. at 250. Congress has utilized the expression "willful misapplication" in a host of criminal statutory provisions. And thus, although few of these crimes are (as in *Morissette*) centuries old, we have much to which we may turn by way of analogy in discerning the elements of willful misapplication, as the term is used in § 1097(a).

*Bates* contends, citing *United States v. Kammer,* 1 F.3d 1161, 1165 (11th Cir.1993),[*] and *United States v. Jakeway,* 783 F.Supp. 590, 597 (M.D.Fla.1992), that we should look for guidance to our interpretation of 18 U.S.C. § 656, which prohibits bank insiders from, among other things, willfully misapplying the bank's funds. This court, like the Eleventh and most of our other sister circuits, has defined the crime of willfully misapplying bank funds to require proof (1) that the defendant intentionally converted bank funds to his own use or the use of another, and (2) that the defendant did so with the specific intent to injure or defraud the bank. *United States v. Crabtree,* 979 F.2d 1261, 1266–67 (7th Cir.1992), *cert. denied,* 510 U.S. 878, 114 S.Ct. 216, 217, 126 L.Ed.2d 173 (1993); *United States v. Bruun,* 809 F.2d

397, 408 (7th Cir.1987). Either the intent to injure or the intent to defraud will suffice, and they are not the same. *United States v. Bates,* 852 F.2d 212, 215 (7th Cir.1988); *United States v. Angelos,* 763 F.2d 859, 861 (7th Cir.1985). For the defendant to have acted with the intent to injure the bank, "it is sufficient that the loan officer engaged in acts, the natural tendency of which would be to injure the bank." *Crabtree,* 979 F.2d at 1268 (quoting *Bruun,* 809 F.2d at 408). Intent to defraud the bank, on the other hand, "means to take financial advantage of a confidential relationship and does not require any intent to injure the bank." *Bates,* 852 F.2d at 215–16 (citing *Angelos,* 763 F.2d at 861–62).

The government concedes that willful misapplication of federally guaranteed student aid funds requires the defendant to have intentionally converted such funds to his own use or the use of a third party, but it argues that the defendant's specific intent to injure or defraud the United States is not an element of the offense. We agree.

The mere fact that we have interpreted willful misapplication of bank funds to require both intentional conversion *and* the intent to injure or defraud the bank does not necessitate the conclusion that specific fraudulent or injurious intent is part and parcel of "willful misapplication." In fact, quite the opposite is true. Intent to injure or defraud the bank is not subsumed within the phrase "willful misapplication," but rather is a separate and distinct component of § 656. *See Crabtree,* 979 F.2d at 1266 (noting that § 656 requires both "that the defendant willfully misapplied funds of the bank" and that he did so "with the intent to injure or defraud the bank"). The point is further illustrated by the Fifth Circuit's recent approval of the following instructions in a bank fund misapplication case:

> To willfully misapply a bank's money or property means an intentional conversion of such money or property to one's own use and benefit, or for the use and benefit

---

[*] Because this opinion conflicts with the Eleventh Circuit's holding in *Kammer,* it was circulated before release to all judges in active service pursuant to 7th Cir. R. 40(e). No judge requested a rehearing en banc.

of another, knowing that one had no right to do so.

To act with the intent to defraud means to act with an intent to deceive or cheat someone, ordinarily for the purpose of causing some financ[ial] loss to another or bringing about some financial gain to oneself.

*United States v. Giraldi*, 86 F.3d 1368, 1376 (5th Cir.1996). Thus, intent to injure or defraud is an offense element that must be proved *in addition* to willful misapplication in a § 656 prosecution.

It is true that the language of § 656, like that of § 1097(a), does not explicitly require the defendant to have acted with specific fraudulent or injurious intent. However, there is a historical rationale for reading into § 656 the requirement of the defendant's intent to injure or defraud the bank. In *Bates*, we explained:

> The current statutory language does not expressly require any proof of [fraudulent or injurious] intent. Originally the statute did require proof of intent to "injure or defraud" the bank or "deceive" a bank officer but these words were inadvertently dropped in the course of a technical revision of the criminal code. To avoid making every unauthorized loan by a bank officer a willful misapplication of bank funds, courts, including our own, read the missing words back into the section.

852 F.2d at 215 (citing *Angelos*, 763 F.2d at 861; *United States v. Shively*, 715 F.2d 260, 266 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984)). Section 1097(a) has never included a requirement that the defendant have acted with an intent to injure or defraud the government, and with no textual or historical basis for doing so, we are *reluctant to read such a* requirement into the statute.

Our reluctance is bolstered by this circuit's prior analysis of 18 U.S.C. § 665, another statute prohibiting the willful misapplication of federal funds—specifically, Comprehensive Employment and Training Act ("CETA") funds. In *United States v. Hamilton*, a defendant charged under § 665 with willful misapplication of CETA funds argued that he could not be convicted because he did not know the monies he misapplied were federal funds. 726 F.2d 317, 320 (7th Cir.1984). Under § 656, a defendant cannot be convicted if he did not know the funds were the bank's because he must have acted with intent to injure or defraud the bank, and thus Hamilton urged this court to pattern our interpretation of § 665's requirements after those of § 656. *Id.* We refused to employ such an analogy, explaining that "we need not wander that far afield, since a closer analogy is found in the general section concerning embezzlement of public money, 18 U.S.C. § 641." *Id.* (citing *United States v. Coleman*, 590 F.2d 228 (7th Cir.1978), *cert. denied*, 440 U.S. 980, 99 S.Ct. 1786, 60 L.Ed.2d 239 (1979)).

Section 641, as construed in *Morissette*, requires only that the defendant intentionally converted public funds to his own use and benefit or to that of a third person. 342 U.S. at 263, 270–72, 72 S.Ct. at 250, 254. Thus, in *United States v. Brown*, we held that " 'misapplication of funds' for purposes of § 665 mean[s] the conversion of funds to the defendant's own use or the use of another," and that "the conversion of CETA funds for the use of uncertified workers when the defendant knows of their uncertified status is a willful misapplication of funds for purposes of § 665." 742 F.2d 363, 366–67 (7th Cir.1984). *But see United States v. Garcia*, 751 F.2d 1033, 1037 (9th Cir.1985) (holding that intent to injure or defraud the United States is an essential element of willful misapplication under § 665). In *Hamilton*, we declined to read into § 665 a § 656–esque requirement that the defendant have acted with intent to injure or defraud the United States, holding:

> We believe that Congress, through § 665, desired to afford federal protection to the large sums of federal money entrusted to nonfederal agencies to accomplish the purposes of CETA, and did not intend to limit this protection to situations where the defendant was aware of a federal interest in the funds.

726 F.2d at 320. This reasoning applies equally here, where Congress has sought through § 1097(a) to provide broad protection for Title IV student financial aid funds entrusted to private educational institutions.

970

■ We conclude, therefore, that intent to injure or defraud the United States is not an element of willful misapplication under § 1097(a). Rather, the government must prove that the defendant misapplied—i.e., converted—Title IV funds and that he did so knowingly and willfully. The Supreme Court has defined willfulness as the "voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12–13, 97 S.Ct. 22, 24, 50 L.Ed.2d 12 (1976). Conversion is an "unprivileged interference with the owner's possession and enjoyment of a chattel." *Kerrigan v. American Orthodontics Corp.*, 960 F.2d 43, 45 (7th Cir.1992); *see also Ross*, 77 F.3d at 1546 (quoting *Kammer's* definition of conversion as "an act of dominion or control over the property that seriously interferes with the owner's rights," 1 F.3d at 1165). *Morissette* explained:

> Conversion ... may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact.

342 U.S. at 271–72, 72 S.Ct. at 254. Thus, as a working definition, willful misapplication under § 1097(a) requires the government to allege and prove that the defendant consciously, voluntarily, and intentionally exercised unauthorized control or dominion over federally provided or guaranteed Title IV funds that interfered with the rights of the funds' true owner(s), for the use and benefit of the defendant or a third person, while knowing that such an exercise of control or dominion over the funds was a violation of the law.

B. Sufficiency of the Indictment's Allegation of Conversion

■ In his motion to dismiss, reiterated on appeal, Bates argued that the indictment was insufficient first because it did not allege intent to injure or defraud the government, and second because it failed to allege sufficient facts to constitute conversion. Having decided that intent to injure or defraud is not an element of § 1097(a), this leaves only Bates's argument that the indictment failed to adequately charge conversion.

■ Facial sufficiency is not a high hurdle. Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense. FED. R. CRIM. P. 7(c)(1) instructs that "[t]he indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." We have held that "[a]n indictment is sufficient if it: (1) states all the elements of the offense charged; (2) informs the defendant of the nature of the charge, enabling the defendant to prepare a defense; and (3) enables the defendant to plead the judgment as a bar to later prosecution for the same offense." *U.S. v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1518 (7th Cir.1993) (citing *United States v. James*, 923 F.2d 1261, 1265 (7th Cir.1991)), *cert. denied*, 510 U.S. 1043, 114 S.Ct. 688, 126 L.Ed.2d 655 (1994). "Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.1981).

Bates argues that the indictment fails to adequately set forth the elements of conversion because it does not charge that his handling of federally guaranteed funds was in any way "unauthorized." Yet, the indictment alleges (1) that the school had a duty to refund unearned student loans to the lender within thirty to sixty days; (2) that due to the participation agreement and the warnings of Acme's financial aid director, Bates knew of this duty; (3) that Bates specifically directed Acme personnel not to make refunds that were required by law; and (4) that Bates instead made management and salary payments to the Jacksons and to Education America, of which Bates happened to be vice president. These factual allegations

clearly make out a charge that Bates's handling of Acme's federally guaranteed student loan funds was unauthorized.

Bates also contends, citing *Hinkle*, 637 F.2d at 1158, that the indictment is insufficient because the term "misapplication" is intrinsically vague. In *Hinkle*, we determined that an indictment charging use of a communication device to facilitate the commission of a felony involving a controlled substance, in violation of 21 U.S.C. § 843(b), was insufficient to inform the defendant of the nature of her alleged crimes. *Id.* Bates argues that "misapplication" is as uninformative as "facilitation." But Bates misunderstands the holding in *Hinkle*. The fatal ambiguity in *Hinkle* was that the indictment, although following the language of the statute in alleging the offense of facilitating a felony involving a controlled substance, failed to identify either the felony facilitated or the controlled substance involved. *Id.* The "facilitation" charge was duplicitous because it could have referred to any one of a number of criminal acts that the defendant may have committed.

Here, on the other hand, Bates has been charged with a distinct, identifiable offense: he willfully misapplied specified amounts of federally guaranteed Title IV funds on twelve specified occasions. Although admittedly bareboned, the indictment in this case included all of the requisite elements of willful misapplication under § 1097(a), and it certainly alleged sufficient facts to apprise Bates of the charges against him.

The judgment of the district court dismissing the indictment is VACATED, and the cause is REMANDED to the district court for further proceedings consistent with this opinion.